# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KALSHIEX LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BRENNA BIRD, in her official capacity as Attorney General of the State of Iowa; the IOWA RACING & GAMING COMMISSION; TINA EICK, in her official capacity as Administrator of the Iowa Racing & Gaming Commission; AMY BURKHART, in her official capacity as Chair of the Iowa Racing & Gaming Commission; LINDA UPMEYER, in her official capacity as Member of the Iowa Racing & Gaming Commission; MICHAEL BOAL, in his official capacity as Member of the Iowa Racing & Gaming Commission; and ALAN OSTERGREN, in his official capacity as Vice Chair of the Iowa Racing & Gaming Commission,<br><br>Defendants. | Case No. 4:26-cv-00109-SHL-HCA<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |

## I. INTRODUCTION.

Plaintiff KalshiEX LLC ("Kalshi") offers "event contracts" in Iowa and elsewhere that, as relevant here, allow users to make money if they correctly predict the outcome of sporting events. Kalshi fears that Iowa Attorney General Brenna Bird and officials with the Iowa Racing and Gaming Commission (the "IRGC Defendants") view the company's business as illegal sports gambling and intend to pursue civil or criminal enforcement action against Kalshi. Kalshi asks for a preliminary injunction barring any such enforcement action, arguing that the (federal) Commodity Exchange Act preempts the application of state gambling laws and regulations to Kalshi's business. In Kalshi's view, only the Commodity Futures Trading Commission ("CFTC") has the authority to regulate the company's event contracts.

For reasons explained in full below, the Court concludes that Kalshi is unlikely to succeed on the merits of its argument that the Commodity Exchange Act preempts Iowa gambling laws and regulations. Accordingly, Kalshi's Motion for Preliminary Injunction (ECF 20) is DENIED.

## II. FACTUAL BACKGROUND.

*A. Iowa Gambling Laws.*

"[G]ambling is a heavily regulated industry in Iowa." *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007). There are at least seven chapters of the Iowa Code that regulate gambling in some form or another, including the following:

- Chapter 99 establishes that buildings or other places used for prostitution or gambling are nuisances. *See, e.g.*, Iowa Code § 99.1A.
- Chapter 99A prohibits the "possession or willful keeping of a gambling device" on licensed premises. Iowa Code § 99A.2(1).
- Chapter 99B permits social and charitable gambling in some circumstances by licensed organizations. *See, e.g.*, Iowa Code § 99B.12.
- Chapter 99D authorizes horse and dog racing at licensed facilities, subject to regulation. *See, e.g.*, Iowa Code §§ 99D.4, 99D.5(1).
- Chapter 99E authorizes "internet fantasy sports contests" when conducted by licensed entities, subject to regulation. *See* Iowa Code §§ 99E.2; 99E.3.
- Chapter 99F authorizes sport gambling when conducted by licensed entities, subject to regulation. *See* Iowa Code §§ 99F.3; 99F.4.
- Chapter 99G authorizes the State to operate a lottery. *See* Iowa Code § 99G.2.

The Iowa Racing and Gaming Commission ("IRGC") is responsible for regulating entities under Chapters 99D, 99E, and 99F. *See* Iowa Code §§ 99D.5(1); 99E.3; 99F.4.

Separately, Iowa Code § 725.7(1) makes it a criminal offense for a person to:

> a. Participate in a game for any sum of money or other property of any value.
>
> b. Make any bet.
>
> c. For a fee, directly or indirectly, give or accept anything of value to be wagered or transmitted or delivered for a wager to be placed within or without the state of Iowa. . . .
>
> e. Engage in bookmaking, except as permitted in chapters 99E and 99F.

Iowa Code § 725.13 states that "'[b]ookmaking' means advancing gambling activity by accepting bets upon the outcome of future contingent events as a business other than as permitted in chapters 99B, 99D, 99E, and 99F."

*B. Kalshi's Business.*

Kalshi characterizes itself as an "exchange" where users—which Kalshi sometimes calls "traders"—can buy or sell event contracts. (ECF 20-2, ¶¶ 15, 32–33.) These event contracts cover

a wide range of subjects, including, by way of example, water availability in the Southwestern United States, whether the Federal Reserve Board will hold an emergency meeting in the year 2026, and whether more than thirty percent of vehicle sales will be electric vehicles by the year 2030. (Id., ¶¶ 43, 45–46.) To the best of the Court's understanding, the contracts are presented to users as a binary choice; meaning, users buy either the "yes" or "no" position on questions like whether the Federal Reserve Board will hold an emergency meeting in 2026. Many of these event contracts relate to sports, such as contracts on which team will win a game or how individual athletes will perform.

Kalshi's business operates differently than a traditional sportsbook. (Id., ¶¶ 32–33.) "Kalshi does not set odds, but instead lets users trade at prevailing market prices. Traders do not bet against the house, but rather enter into contracts with other traders on an exchange." (Id., ¶ 33.) "Kalshi has no interest in whether any given trade is successful or not; it charges a fee for each trade, which is set by a publicly disclosed formula." (Id.) Kalshi's platform "allows traders to exit their position (at the prevailing market price) at any time before a contract settles, including by placing limit orders." (Id.) By contrast, "[a] sportsbook operates by taking bets from gamblers on games where the house has a statistical advantage." (Id., ¶ 32.) "In other words, gamblers bet against the 'house,' and when the house loses, it must pay the gambler." (Id.) "Sportsbooks set the prices at which their customers can transact, building in a margin . . . to keep the odds stacked in their favor" and "control whether bettors can 'cash out' their trades (at prices worse than prevailing betting lines would imply)." (Id.)

Kalshi is regulated by the CFTC in accordance with the Commodity Exchange Act. (Id., ¶¶ 2, 5.) When Kalshi offers a contract on its exchange, it must self-certify that the contract complies with the Act. (Id.) The CFTC has the authority to subject Kalshi's contracts to a ninety-day review process but has not done so to date. (Id., ¶ 6.) In late January 2025, the CFTC asked Kalshi to submit a demonstration of compliance for two sports-event contracts. (Id., ¶ 7.) Kalshi did so, while also providing a memorandum from outside counsel regarding the CFTC's authority to regulate sports event contracts. (Id., ¶¶ 7–8.) The CFTC has taken no further action on Kalshi's sports-event contracts. (Id., ¶ 9.)

*C. Kalshi's Recent Interactions with the Iowa Attorney General's Office.*

On March 4, 2026, Kalshi's Director of State Relations was scheduled for what the company apparently believed would be a one-on-one meeting with Iowa Attorney General Brenna

Case 3:26-cv-00345-EMC Document 58-1 Filed 03/11/26 Page 5 of 24

Bird to discuss a forthcoming Iowa tax bill. (Id., ¶ 12.) However, several members of Attorney General Bird's staff ended up being present. (Id.) During the meeting, Attorney General Bird and her staff asked "pointed questions" about Kalshi's operations. (Id., ¶ 13.) Attorney General Bird said her office has "been looking at this a long time" and acknowledged the meeting was "like a deposition." (Id.) The interaction left Kalshi with the impression that Attorney General Bird views Kalshi's activities relating to sports gambling as illegal under Iowa law. (Id.) To that end, Attorney General Bird has signed multiple amicus briefs alleging that Kalshi's offerings are illegal under state law and challenging whether the CFTC has exclusive authority to regulate Kalshi's business. (Id., ¶ 14; *see also* Brief of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29; Brief of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41-1; Brief of Amici Curiae, *KalshiEX LLC v. Hendrick*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1.)

Kalshi does not allege that anyone from the IRGC was present for the meeting in the Iowa Attorney General's Office, nor does it allege any other interactions between itself and anyone associated with the IRGC.

*D. The Impact on Kalshi's Operations if the State of Iowa Pursues Enforcement Activity.*

Kalshi alleges that if Attorney General Bird and/or the IRGC bring an enforcement action, Kalshi will feel compelled to close all open positions held by Iowa residents on event contracts even when the contracts have not yet settled. (ECF 20-2, ¶¶ 35–36.) (The word "settled," as used here, refers to the completion of the subject of the contract. Thus, for example, a contract on the Chicago Cubs to win a baseball game will "settle" when the game ends and the outcome has been determined.) Based on how the company's exchange operates, Kalshi says the closing of all open contracts held by Iowa residents would create "a significant risk that Kalshi will be unable to restore all Iowa residents who have entered into event contracts to their original position." (Id., ¶ 36.) This alleged risk emanates from the fact that Kalshi's contracts can be bought and resold before the contracts settle. (Id., ¶¶ 33, 37–38.) When there is market fluctuation, the buying and reselling of the contract may create exposure for Kalshi beyond the limits of its collateral. (Id.)

Kalshi does not provide any concrete examples of this exposure, nor is there anything in the company's pleadings to suggest how realistic it is or what the financial magnitude would be. The only "example" Kalshi provides in the Declaration filed in support of its Motion for Preliminary Injunction is a generic $1 contract that User A buys from User B on Kalshi's platform,

with User A paying $0.90 and User B paying $0.10. (Id., ¶ 37.) User A and User B apparently pay these amounts to Kalshi (for a total of $1), with Kalshi then holding the money until the contract settles, at which point Kalshi pays the full $1 to whichever of User A and User B holds the winning side. (Id., ¶¶ 35, 37.) According to Kalshi, if the market fluctuates before the contract settles, User B might end up selling its side of the contract to User C for $0.90. (Id., ¶ 37.) In and of itself, this has no impact on Kalshi, as it still only needs to pay $1 to whichever one of User A or User C ends up holding the winning side of the contract after it concludes. (Id.) But if Kalshi were forced to close all open positions before the contract settles, Kalshi would end up owing User A and User C $0.90 each, for a total of $1.80. (Id.) Meanwhile, Kalshi only has $1 in collateral for the same contract because that is what it originally received, collectively, from User A and User B. (Id., ¶ 38.) Kalshi says it "may lack sufficient funds to cover that difference in value, which could be substantial." (Id.) This, in turn, "would severely damage Kalshi's reputation among users as a trustworthy and secure exchange, and could also lead to significant litigation claims." (Id.)

Although Kalshi characterizes the generic example as "illustrative," it is actually *so* generic as to be nearly meaningless. The Court therefore will attempt to translate it into something more concrete. Suppose the subject of the $1 contract was whether the University of Iowa would win a football game, with users given the opportunity to buy either the "yes" or "no" position. If User A paid $0.90 for the "yes" position, it would mean the University of Iowa was viewed as the heavy favorite to win the game because, in essence, User A would be paying $0.90 for the opportunity to win $1.00. This is a small profit. By contrast, User B would purchase the "no" position for $0.10 and receive a much larger profit if the University of Iowa lost.

If—to stick with the parameters of Kalshi's "illustrative" example—circumstances change and the University of Iowa suddenly becomes a prohibitive underdog, User B might be able to sell the "no" side of the contract to User C for $0.90. User B would keep the $0.80 profit, while User C would now hold the interest in the University of Iowa losing the game. If Kalshi was forced to void the contract before the game was played, however, Kalshi would have to give each of User A and User C $0.90 to reimburse them for what they paid for their respective sides of the contract. This would mean Kalshi has to pay out $1.80 despite only receiving $1 in the first instance. This risk, according to Kalshi, amounts to irreparable harm—although, again, it does nothing to quantify that risk or explain how realistic it is.

Kalshi says its users could face irreparable harm, too, particularly if the market shifts after a user buys a contract. (Id., ¶ 40.) Suppose, for instance, User B pays $0.10 for the "no" position on whether the University of Iowa will win a football game, but this time decides to hold the contract, rather than sell it to User C. If circumstances change and the University of Iowa suddenly becomes a prohibitive underdog, User B's position would end up being worth far more than $0.10. Nonetheless, if Kalshi were forced to void the contract, User B would end up receiving only the reimbursement of the original $0.10 purchase price even though the value of its position would be considerably higher than $0.10. (*See* id., ¶ 41.) Kalshi says this would cause a "massive disruption to users' investment-based expectations." (Id., ¶ 43.)

In the event of enforcement by Attorney General Bird or the IRGC, Kalshi also alleges irreparable harm in the form of costs and logistical challenges associated with identifying which of its users are located in Iowa and preventing those users from accessing Kalshi's platform. (Id., ¶¶ 17–28.) The "geofencing" technology Kalshi would need to deploy would cost up to tens of millions of dollars per year and yet be both under- and over-inclusive in terms of identifying Iowa-based users. (Id., ¶¶ 26–27.) In total, Kalshi says it has "nearly 42,000 verified users in Iowa with millions of dollars invested on [Kalshi's] exchange." (Id., ¶ 59.)

Finally, Kalshi alleges irreparable harm in the form of what it characterizes as a "Catch-22" between the requirements imposed by the CFTC and those imposed under Iowa gambling laws. (Id., ¶ 57.) Kalshi must follow certain CFTC Core Principles in connection with its event contracts, including providing "impartial access to its markets and services," 17 C.F.R. § 38.151(b), and "prevent[ing] manipulation, price distortion, and disruptions of the delivery or cash-settlement process," 17 C.F.R. § 38.250. (Id., ¶¶ 51–52.) Kalshi alleges that it could not close the open-but-not-settled contracts for Iowa users or preclude Iowa users from accessing its market without running afoul of these Core Principles, thus creating a risk of civil or criminal liability under federal law. (Id., ¶¶ 53–54.)

*E. Procedural History.*

Kalshi moves for a preliminary injunction, arguing that the Commodity Exchange Act preempts any attempt that Attorney General Bird or the IRGC Defendants might make to pursue enforcement activity under Iowa gambling laws and regulations. (ECF 20.) Attorney General Bird and the IRGC Defendants resist, arguing that Kalshi has not established standing or a likelihood of success on the merits. (ECF 24.) The American Gaming Association has submitted an amicus

brief in opposition to Kalshi's position (ECF 47), as has a group of federally recognized Indian tribes and corresponding gaming associations and organizations (ECF 46).

## III. LEGAL ANALYSIS: STANDING.

### *A. Legal Background.*

As a preliminary matter, the Court must decide whether Kalshi has standing to pursue injunctive relief. To establish standing, "a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). "This 'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Whether a plaintiff has shown such an injury 'often turns on the nature and source of the claim asserted.'" *Id*. (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). "[T]he question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." *Id.*

### *B. Kalshi Has Established Standing as to Attorney General Bird but Not the IRGC Defendants.*

Defendants challenge standing in several ways, starting by asserting that some of the nine chapters of the Iowa Code (Chapters 99, 99A, 99B, 99C, 99D, 99E, 99F, 99G, and 725)[1] identified in Kalshi's Motion for Preliminary Injunction do not appear—even arguably—to apply to Kalshi's business. They further assert that Attorney General Bird does not have the power to initiate regulatory actions under most of those Chapters. Instead, at most, her authority is largely limited to pursuing criminal violations under Chapter 725. Similarly, the IRGC Defendants are only responsible for enforcing Chapters 99D, 99E, and 99F. Finally, but more generally, Defendants argue that Kalshi has not established an imminent risk of enforcement by *any* Defendant.

The Court agrees that Kalshi does not have standing for at least some aspects of the company's sweeping request for injunctive relief. All the same, the company's central argument is that the Commodity Exchange Act preempts state gambling laws in their entirety. Thus, if Kalshi can establish a credible fear of prosecution under even a single provision of the Iowa Code that

[1] In its Brief in Support of Preliminary Injunction, Kalshi asks to enjoin enforcement of Iowa Code Chapter 99C—which is "reserved"—and does not mention Iowa Code Chapter 99E, which authorizes "fantasy sports contests." (ECF 20-1, p. 9.) By contrast, the Complaint correctly omits Chapter 99C but includes Chapter 99E in its request for declaratory and injunctive relief. (ECF 1, p. 24.)

Case 3:26-cv-03415-EMC Document 58-1 Filed 09/11/26 Page 9 of 24

criminalizes unauthorized gambling, Kalshi will have standing to seek injunctive relief against Attorney General Bird at least as to that provision on a preemption theory. *See generally Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (applying "credible threat of prosecution" standard).

Here, Iowa Code § 725.7(1) makes it a criminal offense for a person to:

> a. Participate in a game for any sum of money or other property of any value.
>
> b. Make any bet.
>
> c. For a fee, directly or indirectly, give or accept anything of value to be wagered or transmitted or delivered for a wager to be placed within or without the state of Iowa. . . .
>
> e. Engage in bookmaking, except as permitted in chapters 99E and 99F.

Although Kalshi's pleadings use artful language, a reasonable person could view the company's business as including activities that are proscribed by this statute. Indeed, Iowa Code § 725.13 states that "'[b]ookmaking' means advancing gambling activity by accepting bets upon the outcome of future contingent events as a business other than as permitted in chapters 99B, 99D, 99E, and 99F." Accordingly, Kalshi's fear of prosecution or enforcement is not speculative. *See Babbitt*, 442 U.S. at 302 (holding that standing existed where fear of prosecution was not "imaginary or wholly speculative" and statutory provision "on its face" proscribed the proposed conduct). It follows that standing exists at least as to Kalshi's request for injunctive relief against Attorney General Bird associated with potential action under Iowa Code § 725.7(1).

The fact that Attorney General Bird does not have an active investigation against Kalshi does not change this conclusion. She "has not disavowed" any intention of pursuing such an investigation, *see Babbitt*, 442 U.S. at 302, instead merely promising not to open one before Kalshi's Motion for Preliminary Injunction is decided. Meanwhile, according to the meeting she and others in her office held with Kalshi earlier this year and her participation in amicus briefs in other states, it is clear the company is on her radar, just as Kalshi has been on the radar of attorneys general and/or regulatory agencies in other states across the country. Thus, the company has established a sufficiently credible fear of prosecution to satisfy the requirements of Article III standing as against Attorney General Bird. *See St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486–87 (8th Cir. 2006) (concluding that plaintiffs had credible fear of prosecution under non-dormant law that had been the subject of recent attention); *United Food & Com. Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422, 429 (8th Cir. 1988) (holding that standing

existed even though state officials had no "present plan" to enforce statute because state's position "could well change").

Kalshi has arguably failed to establish standing as to the IRGC Defendants given that the company has apparently never had any interactions with the IRGC at all, much less interactions that might suggest imminent enforcement activity. All the same, the IRGC Defendants have the authority to pursue action against Kalshi for engaging in gambling or sports wagering without an appropriate license. *See* Iowa Code § 99F.4(13). For this reason—and because Kalshi has standing against Attorney General Bird anyway—the Court will evaluate Kalshi's Motion for Preliminary Injunction on the merits as to all Defendants.

## IV. LEGAL ANALYSIS: MOTION FOR PRELIMINARY INJUNCTION.

### *A. Legal Standards.*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he burden of establishing the propriety of an injunction is on the movant." *Id.* (quoting *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021)). Courts must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

The likelihood of success factor is entitled to the most weight. *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020). In fact, "[w]hen a plaintiff seeks an injunction against the enforcement of a state statute, the plaintiff's failure to carry his burden on the likelihood-of-success factor is fatal to his case." *Eggers v. Evnen*, 48 F.4th 561, 566 (8th Cir. 2022). For actions that seek to enjoin the enforcement of a duly enacted state statute, the plaintiff party must show that it is likely to prevail on its claims. *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019). This is a higher standard than applies to the likelihood-of-success factors in other preliminary injunction cases. *See id*. "We apply a heightened standard in such instances because the duly enacted state statute constitutes government action based on presumptively reasoned democratic processes, and such action is entitled to a higher degree of deference and should not be enjoined lightly." *Id.* (internal punctuation and citation omitted).

As for the other three factors, a plaintiff "is not required to prove with certainty the threat of irreparable harm, but it must prove that 'irreparable injury is likely in the absence of an injunction.'" *Sleep No. Corp.*, 33 F.4th at 1018 (quoting *Winter*, 555 U.S. at 22). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In balancing the equities, [the Court] weigh[s] 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys.*, 640 F.2d at 113.) This "requires a court to distinguish between weak or illusory injuries and very real threats of injuries." *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 798 (S.D. Iowa 2022) (internal punctuation and citation omitted). It considers harm to both the litigants and other interested parties, like the public. *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1047 (N.D. Iowa 2008). The last factor, the public interest, "invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Id*. at 1048.

*B. Kalshi Is Not Likely to Succeed on the Merits of its Preemption Arguments.*

1. <u>Statutory Background.</u>

The Commodity Exchange Act created a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 355–56 (1982) (citation omitted). Historically, futures trading revolved around agricultural commodities and served, among other purposes, to protect market participants against fluctuation related to weather or other external factors. *See id.* at 360–64 (summarizing history). Over time, the scope of the Commodity Exchange Act expanded, eventually resulting in the creation of the CFTC, which was given "'exclusive jurisdiction' with respect to 'accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery' where such transactions are 'traded or executed' in particular markets or platforms, including a 'contract market designated pursuant to section 7 of this title.'" *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 672 (D. Md. 2025) (quoting 7 U.S.C. § 2(a)(1)(A)), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025).

The inclusion of "swaps" in the Commodity Exchange Act arose "in the wake of the 2007–2008 financial crisis, which many attributed to poorly regulated derivatives markets, when

Case 3:26-cv-00415-ELM-C Document 58-1 Filed 09/10/26 Page 12 of 24

Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. . . ." *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 373 (D.C. Cir. 2013). "Dodd-Frank . . . gave CFTC regulatory authority over swaps, and amended the statutory definition of commodity pool operators to include entities that trade swaps." *Id.* at 374. As relevant here, a "swap" is defined as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence . . . ." 7 U.S.C. § 1a(47)(A)(ii). The definition of "swap" does not include any specific reference to sporting events or sports betting.

Entities that wish to participate in markets regulated by the Commodity Exchange Act must submit an application to the CFTC to be certified as a Designated Contract Market. *See Martin*, 793 F. Supp. 3d at 672. If certified, the entity may list agreements, contracts, transactions, and/or swaps on its market, subject to CFTC rules and regulations. *See id.* at 672–73. Kalshi has been certified since 2020 as a Designated Contract Market. (ECF 20-1, ¶ 15.) Kalshi offers contracts in a wide range of areas, including, as relevant here, contracts related to sporting events.

The Dodd-Frank Act included a "Special [R]ule for review and approval of event contracts and swaps contracts." 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule states, in relevant part:

> **(i) Event contracts**
>
> In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the [CFTC] may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—
>
> (I) activity that is unlawful under any Federal or State law;
>
> (II) terrorism;
>
> (III) assassination;
>
> (IV) war;
>
> (V) gaming; or
>
> (VI) other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest.

Case 4:26-cv-00349-SHL-HCA Document 51 Filed 09/08/26 Page 12 of 23

*Id.* (footnote omitted). The Special Rule further states: "No agreement, contract, or transaction determined by the [CFTC] to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii).

2. Kalshi is Unlikely to Succeed on its Position that the Commodity Exchange Act Expressly Preempts State Gambling Laws.

"Put simply, federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016). "As relevant here, Congress can preempt state law in one of three ways: (1) expressly through statutory language like a preemption clause; (2) implicitly when a state law 'conflict[s] with' or stands as an obstacle to federal law; and (3) implicitly by 'occup[ying] a legislative field,' leaving no room for state law." *WinRed, Inc. v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023) (quoting *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993)). "Our inquiry into the scope of a [federal] statute's pre-emptive effect is guided by the rule that '"the purpose of Congress is the ultimate touchstone" in every pre-emption case.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "A state law is preempted where 'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law,' as well as 'where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hughes*, 578 U.S. at 163 (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 509 (1989) and *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). Kalshi argues, first, that the Commodity Exchange Act expressly preempts state regulation of Designated Contract Markets, and thus that Attorney General Bird and the IRGC Defendants may not enforce gambling laws against Kalshi or other companies that have been certified as Designated Contract Markets and offer contracts on sporting events.

Gambling was not a focal point for Congress when it amended the Commodity Exchange Act through the Dodd-Frank Act. Instead, the purpose of the Dodd-Frank Act was to address the role unregulated financial derivatives played in contributing to the financial crisis of 2007 and 2008. *See Martin*, 793 F. Supp. 3d at 672. Gambling had nothing to do with this. In fact, at the time the Dodd-Frank Act was enacted, sports gambling was illegal in all but four states under the Professional and Amateur Sports Protection Act. *See generally Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 460–62 (2018). In context, there is no reason why Congress would have given much attention to gambling when it enacted the Dodd-Frank Act.

The text of the Commodity Exchange Act, as amended by the Dodd-Frank Act, reinforces the insignificance of gambling to the purpose of the law. In the definition of "swap," for example, there are dozens of references to financial instruments associated with financial or commodities markets. *See* 7 U.S.C. § 1a(47)(A)(i), (iii). There is no mention of sports or gambling. Instead, at most, Congress mentioned "gaming" in the Special Rule, *id.* § 7a-2(c)(5)(C)(i), when it gave the CFTC the express authority to forbid certain types of contracts or transactions from appearing on Designated Contract Markets. In addition to "gaming," the Special Rule identified "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest." *Id.* The inclusion of "gaming" in the list suggests Congress's awareness that a Designated Contract Market might end up with contracts connected to gambling to some degree or another. However, by lumping "gaming" together with "terrorism," "assassination," "war," and other "unlawful" conduct, Congress clearly viewed "gaming" contracts as a bad thing.

Against this backdrop, there is a high degree of irony in Kalshi's position. The company is using a federal law that mostly ignored gambling (probably because it was largely illegal at the time of the Dodd-Frank Act) other than mentioning it in an unmistakably negative way (placing it on par with "terrorism," "assassination," and "war") to argue that Congress intended to *allow* gambling free from state regulatory oversight so long as the gambling is structured the right way. In a big picture sense, it is difficult to believe this is what Congress wanted. *See Martin*, 793 F. Supp. 3d at 683 (characterizing it as "highly unlikely" that Congress intended to preempt sports gambling laws given the history of such laws); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1031–32 (D. Nev. 2025) ("It is absurd to think that Congress intended for [Designated Contract Markets] to turn into nationwide gambling venues . . . to the exclusion of state regulation . . . without ever mentioning that was the goal when Congress added swaps to the [Commodity Exchange Act] in 2010."), *aff'd in part and remanded sub nom. KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846 (9th Cir. Aug. 28, 2026).

Kalshi argues, however, that the Commodity Exchange Act gives exclusive regulatory oversight to the CFTC for event contracts traded on Designated Contract Markets regardless of their subject matter. Kalshi's position rests on 7 U.S.C. § 2(a)(1)(A), which gives CFTC "exclusive jurisdiction" over "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery" if the transactions are "traded or executed on a contract market

designated pursuant to section 7 of this title" or otherwise regulated by the CFTC. Because Kalshi is a Designated Contract Market that has self-certified sports-related event contracts in accordance with the Commodity Exchange Act, Kalshi argues that only the CFTC, not state regulators, can regulate those contracts.

Kalshi's express preemption argument arises out of what it views as an express preemption clause. Thus, in an abundance of caution, the Court will "not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)). The Court is mindful, however, that Kalshi is asking the Court to preempt the application of state gambling laws, which are "within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905); *see also Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 439 ("A state's police power encompasses controlling gambling, even to the point of abolishing a particular lottery game."); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) ("It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme."). Indeed, in Congress's own words, "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). If Congress truly intended to preempt state gambling laws when it enacted and amended the Commodity Exchange Act despite having endorsed state regulatory authority over gambling in other statutes, "[t]he textual commitment must be a clear one." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

The "textual commitment" in the Commodity Exchange Act does not meet the mark. The CFTC's "exclusive jurisdiction" extends only to the regulation of "swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). The word "swap," in turn, is defined as "any agreement, contract, or transaction . . . (ii) that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence . . . . " *Id.* § 1a(47)(A)(ii). In context, it is easy to conclude that the word "event" or "occurrence" covers events in financial or asset markets like changes in interest rates or grain prices. It is harder to conclude that Congress intended for "event" or "occurrence" to encompass the outcome of a sporting event. In general parlance, one would not describe, say, the Minnesota

Vikings winning a football game as an "occurrence" or "event." Instead, the game itself would be the "occurrence" or "event," with the final score being the "result" or "outcome." *See N. Am. Derivatives Exch., Inc. v. Nev. ex rel. Nev. Gaming Comm'n*, 815 F. Supp. 3d 1169, 1183 (D. Nev. 2025) ("[T]he ordinary meaning of event in terms of sports would be the sporting event itself, not who wins it."); *KalshiEX LLC v. Cafferelli*, No. 25-cv-2016, 2026 WL 2294589, at *7 (D. Conn. Aug. 10, 2026) (similar), *appeal docketed*, No. 26-2239 (2d Cir. Aug. 12, 2026). The Commodity Exchange Act's use of such ill-fitting language makes it difficult to conclude that Congress intended to allow companies like Kalshi to enter the field of sports gambling free from state regulation. *See N. Am. Derivatives Exch., Inc.*, 815 F. Supp. 3d at 1185 ("Had Congress intended such a sea change in the regulatory landscape, it surely would have said so.").

These doubts are reinforced by other aspects of the Commodity Exchange Act, including language establishing that a "swap" exists when the "occurrence" of an "event" has a "potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). In the context of financial or asset markets, the relationship between the "event" and the "consequence" is typically direct: if grain prices fall, the sale of crops will yield less revenue; if interest rates rise, it will become more expensive for consumers and businesses to take out loans. And the "swap" is generally designed to allow market participants to hedge risk associated with those "events" and "consequences." *See Assad*, 2026 WL 2543846, at *10. By contrast, "Kalshi's sports event contracts do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers, where none previously existed." *Id.* Moreover, in the context of sporting events, the relationship between an "event" or "occurrence" (if one were to use those words to describe the outcome of a competition in the first place) and the "consequence" is far less direct anyway. For example, there is little, if any, direct financial consequence from the Chicago Cubs winning a baseball game in August; instead, at most, if the Cubs win enough games over an extended period of time, they might make the playoffs, become more attractive to advertisers, sell more tickets, and/or decide to extend contracts with star players. This is very different than the direct relationship between the "event" and the "consequence" in financial or asset markets. Thus, again, it is difficult to conclude that Congress had state gambling laws in mind at all when it gave the CFTC "exclusive jurisdiction" over "swaps," much less that it intended to preempt those laws.

Granted, as Kalshi argues, the definition of "swap" in 7 U.S.C. § 1a(47)(a)(ii) refers broadly to "*potential* financial, economic, or commercial consequence[s]" (emphasis added). In

Kalshi's view, this means Congress intended for the CFTC to have exclusive regulatory authority in areas outside of traditional financial instruments and regardless of how direct or indirect the relationship is between the "event" and the "consequence." The problem for Kalshi, however, is that the surrounding statutory language defines "swap" in a way that focuses on financial instruments that are designed to hedge risk in asset markets like commodities, securities, and housing. For example, § 1a(47)(a)(i) defines "swap" to include "a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." The obvious focus of these words is on financial instruments that allow market participants to hedge risk. The same is true in § 1a(47)(A)(iii), which lists twenty-two examples of a swap: "interest rate swap," "rate floor," "rate cap," "rate collar," "cross-currency rate swap," "basis swap, "currency swap," "foreign exchange swap," "total return swap," "equity index swap," "equity swap," "debt index swap," "debt swap," "credit spread," "credit default swap," "credit swap," "weather swap," "energy swap," "metal swap," "agricultural swap," "emissions swap," and "commodity swap." None of these come remotely close to referring to contracts involving gambling or sporting events that create risk where it did not otherwise exist. *See Cafferelli*, 2026 WL 2294589, at *9 ("The Court thus interprets the phrase 'associated with a potential financial, economic, or commercial consequence[]" to mean that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence.").

When interpreting statutes like this one, federal courts "rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" *Yates v. United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). This limiting principle is particularly important in the context of preemption, where "uncritical literalism" can lead to results that "no sensible person could have intended." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 656 (1995) and *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 336 (1997) (Scalia, J., concurring)). Here, although Kalshi's argument might seem appealing if one looks at the language of § 1a(47)(a)(ii) in a vacuum, the argument loses force once the surrounding statutory context is

Case 3:26-cv-00345-EMC Document 58-1 Filed 09/10/26 Page 18 of 24

included in the analysis. Read collectively, the definitions of "swap" in § 1a(47)(a) show that Congress was focused on financial instruments that hedge risk for direct market participants, not gambling contracts.

In analogous circumstances, the Supreme Court has used the surrounding statutory context to interpret otherwise-broad language in a way that honors Congressional intent. In *Gustafson v. Alloyd Co.*, 513 U.S. at 574–75, for example, the Supreme Court had to decide whether a private sales agreement was a "prospectus" for purposes of the Securities Act of 1933, which defined "prospectus" to mean "any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security." 15 U.S.C. § 77b(10). The plaintiff argued that the private sales agreement fit the literal definition of "any . . . communication" and therefore was within the scope of the Act. *Gustafson*, 513 U.S. at 574–75. The Supreme Court disagreed, for two reasons. First, if the word "communication" was truly that broad, it would render superfluous the words "notice, circular, advertisement, [and] letter" in the definition of "prospectus." *Id.* This would violate the canon of construction that statutes should be interpreted to give effect to every word. *Id.* at 574 ("[T]he Court will avoid a reading which renders some words altogether redundant."). Second, because the word "communication" was surrounded by words like "notice, circular, [and] advertisement," the Supreme Court concluded that Congress intended for "communication" to mean "documents of wide dissemination," not literally *any* communication. *Id.* at 575; *see also, e.g.*, *Yates*, 574 U.S. at 543–44 (interpreting the words "tangible object" in the phrase "any record, document, or tangible object" to mean the *subset* of tangible documents involving records and documents); *Reves v. Ernst & Young*, 494 U.S. 56, 62–63 (1990) ("Thus, the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts.").

The same logic applies here. If, as Kalshi argues, the definition of "swap" in § 1a(47)(a)(ii) is broad enough to include things like contracts on the outcome of sporting events, there is no reason for Congress to have included narrower definitions—with dozens of examples—in §§ 1a(47)(a)(i) and (iii). Indeed, under Kalshi's approach, it appears that every word of subsections (i) and (iii) is subsumed within subsection (ii) and thus superfluous. *See Gustafson*, 513 U.S. at 574–75. This is not the right way to read the statute. *See id.* The far better reading is that Congress intended for subsection (ii) to refer to the *subset* of "agreement[s], contract[s], or transaction[s]"

that involve financial instruments like those identified in subsections §§ 1a(47)(a)(i) and (iii) that are designed to help market participants hedge risk in asset markets like commodities, equities, and housing. *See Yates*, 574 U.S. at 543–44. Sports-related event contracts do not fit within this definition. *See Cafferelli*, 2026 WL 2294589, at *9. It follows that the CFTC does not have "exclusive jurisdiction" over them.

3. <u>Kalshi's Express Preemption Position Would Be Even Weaker if the Presumption Against Preemption Applies, as it Arguably Should.</u>

In an abundance of caution, the analysis in the preceding section rested on the premise that the presumption against preemption does not apply to Kalshi's argument that the Commodity Exchange Act preempts state gambling laws. A strong argument can be made, however, that the premise is wrong. If so, Kalshi's position on the merits is even weaker.

"Where it applies, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13 (2013) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "That rule of construction rests on an assumption about congressional intent: that 'Congress does not lightly exercise' the 'extraordinary power' to 'legislate in areas traditionally regulated by the States.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). In relatively recent cases, the Supreme Court has declined to apply the presumption when the federal law includes an express preemption provision. *See Franklin*, 579 U.S. at 125; *Gobeille*, 577 U.S. at 325–26; *see also Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 967 (8th Cir. 2021).

The "exclusive jurisdiction" provision in 7 U.S.C. § 2(a)(1)(A) is very different, however, than the preemption clauses at issue in cases like *Gobeille* and *Franklin*. The former involved the Employee Retirement Security Act of 1974 ("ERISA"), which contains a "terse but comprehensive" preemption provision that preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." *Gobeille*, 577 U.S. at 319 (quoting 29 U.S.C. § 1144(a)). The preemptive intent is unambiguous. Similarly, although the preemption provision at issue in *Franklin* was narrower, it too was unambiguous in terms of preemptive intent, specifically targeting state laws affecting the measurement of a municipality's indebtedness to a creditor. 579 U.S. at 123 (citing 11 U.S.C. § 903(1)). Here, by contrast, the "exclusive jurisdiction" provision was arguably not designed to be preemptive at all, but rather simply to identify the CFTC as the lead *federal* regulator over Designated Contract Markets, as compared to agencies like the

Case 3:26-cv-03415-EMC Document 58-1 Filed 09/11/26 Page 20 of 24

U.S. Securities and Exchange Commission ("SEC"). *See Martin*, 793 F. Supp. 3d at 678; *see also Merrill Lynch,* 456 U.S. at 386–87 (explaining that Congress wanted to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies"). Thus, although it is fair to say that Congress intended for the Commodity Exchange Act to have *some* preemptive effect, *see Martin*, 793 F. Supp. 3d at 678, it is harder to say the "exclusive jurisdiction" provision was the mechanism it intended to use to get there. It is simply not the type of "express" preemption clause that has been present in cases where the Supreme Court has declined to apply the presumption.

Moreover, Kalshi is using the "exclusive jurisdiction" provision in a circuitous and backdoor way. The starting point for the company's preemption argument is that Kalshi obtained certification as a Designated Contract Market, thus becoming subject to CFTC oversight. But this occurred in 2020, several years before Kalshi first offered sports-related event contracts. Since then, Kalshi has made sports-related contracts available after "self-certifying" that they comply with the Commodity Exchange Act. The CFTC has never affirmatively approved them. Thus, in a nutshell, Kalshi is asking for preemption to apply (a) in a field (sports gambling) that is traditionally occupied by the States (b) based largely on the CFTC's *silence* despite (c) statutory language that arguably was not intended to be preemptive at all. It is easy to understand why some courts have chosen to apply the presumption against preemption in these circumstances. *See Martin*, 793 F. Supp. 3d at 676; *KalshiEX LLC v. Williams*, No. 25 CIV. 8846, 2026 WL 1961872, at *6 (S.D.N.Y. July 7, 2026), *amended*, No. 25 CIV. 8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026), *appeal docketed*, No. 26-1835 (2d Cir. July 8, 2026). The fact that this Court arguably could have done so, too, further demonstrates the weakness of Kalshi's position on express or complete preemption.

4. <u>Kalshi Is Unlikely to Succeed on its Position that the Commodity Exchange Act Preempts Iowa Gambling Laws Under Field Preemption.</u>

Kalshi also argues that state regulation of its sports-related event contracts is impermissible under the doctrine of field preemption, which applies when Congress "intended 'to foreclose any state regulation in the *area*,' irrespective of whether state law is consistent or inconsistent with 'federal standards.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)). Kalshi's field preemption argument fails for the same reason as its express preemption argument: sports-event contracts are not "swaps" under the Commodity Exchange Act and thus are not subject to the CFTC's "exclusive jurisdiction."

To the extent Kalshi's field preemption argument rests on the language and structure of the Commodity Exchange Act more generally—i.e., that field preemption applies even if the Court is correct in concluding that Kalshi's sports-event contracts are not "swaps" subject to the "exclusive jurisdiction" of the CFTC—the argument is subject to the presumption against preemption. Cases like *Gobeille* and *Franklin* only hold that the presumption is inapplicable when there is an express preemption provision. In implied preemption cases, the presumption continues to apply when the field in question is traditionally reserved to the States. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citing *Medtronic*, 518 U.S. at 485 and *Rice*, 331 U.S. at 230). Gambling is clearly such a field. *See Hawkeye Commodity Promotions, Inc.*, 486 F.3d at 439

When the presumption is applied, Kalshi's field preemption argument is highly unlikely to succeed. It is simply not reasonable to conclude that Congress implicitly intended to foreclose state regulation in the entire field of sports gambling when it passed a law that had nothing to do with gambling. *See Hendrick*, 817 F. Supp. 3d at 1031–32; *Martin*, 793 F. Supp. 3d at 683. Indeed, Kalshi's field preemption argument revolves primarily around the fact that Congress created the CFTC and gave it jurisdiction over at least some of Kalshi's business. "We ordinarily do not infer pre-emption from the mere existence of a federal enforcement mechanism." *Watson v. Air Methods Corp.*, 870 F.3d 812, 819 (8th Cir. 2017).

The inclusion of the savings clause in 7 U.S.C. § 2(a)(1)(A) reinforces this conclusion. It states:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities . . . of any State, or (II) restrict . . . such other authorities from carrying out their duties and responsibilities in accordance with such laws.

*Id.* The mere existence of a savings clause generally "negates the inference" that Congress intended to preempt the entire field of state gambling laws. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987); *see also Martin*, 793 F. Supp. 3d at 681. When, as here, the "field" is traditionally reserved for the States and the savings clause follows statutory language that does not have preemptive effect anyway, there is little room left for debate. Field preemption will not apply.

5. <u>Kalshi Is Unlikely to Succeed on its Conflict Preemption Argument.</u>

Kalshi's final preemption argument is based on conflict preemption, which applies "when state law imposes a duty that is inconsistent with federal law." *Iowans for Alts. to Smoking & Tobacco, Inc. v. Mosiman*, 183 F.4th 1040, 1050 (8th Cir. 2026). "Conflict preemption is divided

Case 4:26-cv-00345-SEH-MC Document 58-1 Filed 09/11/26 Page 22 of 24

into two types: impossibility preemption and obstacle preemption." *Id.* The former applies "when compliance with both federal and state regulations is a physical impossibility." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605 (1991) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)). "Obstruction preemption exists 'when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 939 (8th Cir. 2011) (quoting *Wis. Pub. Intervenor*, 501 U.S. at 605). Kalshi focuses on impossibility preemption here, arguing that it cannot comply with what it characterizes as "Congress's goal of a uniform federal scheme" if it also must comply with "[p]iecemeal state-by-state regulation." (ECF 20-1, p. 28.) It further argues that state-by-state compliance is impossible because Kalshi cannot reliably limit access to its markets based on a user's geographic location. (Id., p. 29.) Finally, it argues that the Special Rule authorizes the CFTC alone to bar "gaming" contracts if they are "contrary to the public interest," but the CFTC has not done so. (Id., p. 30.)

These arguments are unavailing. If, as the Court concluded above, sports-related event contracts are not "swaps" under the Commodity Exchange Act, there is no "uniform federal scheme" with respect to such contracts, nor does the CFTC have the "exclusive authority" to permit or forbid them. Instead, Kalshi simply must follow the laws and regulations of each state in which it makes those contracts available, in addition to following whatever federal requirements exist through the CFTC. This may be inconvenient for Kalshi, but it is not impossible. *See Cafferelli*, 2026 WL 2294589, at *14 ("The fact that Connecticut law imposes an additional regulatory requirement on Kalshi does not, without more, establish a conflict with federal law."); *Martin*, 793 F. Supp. 3d at 686 ("So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland."). Indeed, other companies engaged in sports gambling already do this.

Granted, it is at least theoretically possible that Kalshi will face isolated conflict issues if, for example, Attorney General Bird or the IRGC pursues enforcement action in a way that causes Kalshi to cancel open sports-event contracts, but the CFTC takes action to prohibit Kalshi from doing so. This is, however, not a reason to impose across-the-board injunctive relief. Instead, at most, Kalshi can pursue injunctive relief on a narrower basis that corresponds to the actual conflict.

*C. The Remaining Preliminary Injunction Factors Are Either Irrelevant or Do Not Support Kalshi's Request for Injunctive Relief.*

"When a plaintiff seeks an injunction against the enforcement of a state statute, the plaintiff's failure to carry his burden on the likelihood-of-success factor is fatal to his case." *Eggers*, 48 F.4th at 566. Here, Kalshi has failed to establish a likelihood of success on any of its preemption arguments. Accordingly, the Court need not evaluate the remaining preliminary injunction factors. *See Iowans for Alts. to Smoking & Tobacco, Inc.*, 183 F.4th at 1055.

Even if those factors were considered, however, the result would not change. Kalshi should have known all along that its sports-related event contracts might be interpreted by state regulators as sports gambling; indeed, the company has characterized itself in an advertisement as "the first app for legal sports betting in all 50 states." *Assad*, 2026 WL 2543846, at *2. Nonetheless, Kalshi charged ahead with its business without, apparently, making any effort to learn whether the Iowa Attorney General or IRGC viewed the company's sports-related event contracts as illegal gambling. To the extent it would be expensive in these circumstances for Kalshi to deploy new technology or change aspects of its business to ensure compliance with Iowa law, this is a problem of the company's own making. It should have proceeded with greater caution. *See Sierra Club v. U.S. Army Corp of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011) (recognized that "self-inflicted" harms may be discounted when evaluating whether to enter a preliminary injunction).

Moreover, although Kalshi's preliminary injunction filings are heavy on hyperbole regarding irreparable harm, they provide virtually no concrete information about the extent of the risk to the company if injunctive relief is denied. At most, Kalshi simply says it has "nearly 42,000 users in Iowa with millions of dollars in open contracts" and might suffer losses on those contracts if they must be invalidated before settling. (ECF 20-1, p. 31.) Without additional context, it is impossible to tell what this means. For example, Kalshi does not specify how many of its contracts relate to sports and thus would be impacted by an enforcement action by Attorney General Bird or the IRGC Defendants. Kalshi also does not explain how often it ends up with exposure in excess of the value of a contract due to market fluctuations and the buying and re-selling of the contract before it settles. (ECF 20-2, ¶¶ 37–38.) Indeed, Kalshi does not even give a real-world example of this scenario, instead providing a generic example in which the odds of an event happening shift from ninety percent in one direction to ninety percent in the other. (Id.) It seems highly unlikely that the odds of, say, a team winning a football game would shift so dramatically before the game is played. In lieu of concrete, real-world information about any of these matters, Kalshi simply

says that its "precise numbers are not public." (Id., ¶ 30.) In a situation where Kalshi bears the burden of proving that injunctive relief is appropriate, this is nowhere close to enough, particularly when balanced against the interests of state officials and the general public in the enforcement of duly enacted gambling laws.

**V. CONCLUSION.**

Because Kalshi has not established a likelihood of success on the merits of its argument that the Commodity Exchange Act preempts Iowa gambling laws and regulations, the Court DENIES the Motion for Preliminary Injunction. (ECF 20.)

**IT IS SO ORDERED.**

Dated: September 8, 2026

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE