United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PRABHDEEP CHEHAL, et al.,
Plaintiffs,
v.
ROBINHOOD MARKETS, INC., et al.,
Defendants.

Case No. 26-cv-03415-EMC

**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION**

Docket No. 46

Plaintiffs are individuals in four now-consolidated cases. They have sued two Robinhood entities: Robinhood Markets (the parent) and Robinhood Derivatives (the subsidiary). The two entities shall hereinafter be referred to collectively as "Robinhood." According to Plaintiffs, Robinhood unlawfully operates an unlicensed sports gambling program and misleads customers into believing that sports "event contracts" are not gambling, but rather a modern, sophisticated form of investing on a federally regulated commodities exchange (known as a designated contract market or "DCM").

Pending before the Court is Robinhood's motion to compel arbitration. Specifically, Robinhood moves to compel arbitration with respect to 10 out of the 11 plaintiffs in the four consolidated cases.[1] *See* Mot. at 1. Plaintiffs oppose the motion to compel, arguing, *e.g.*, that there were no agreements to arbitrate (at the very least, not for the kinds of claims they have brought here), that the arbitration agreements are unconscionable, and that Robinhood Markets

[1] "Only Plaintiff Ngafua [a resident of Michigan] chose not to agree to arbitration." Mot. at 3, Martin Decl., Ex. H. The other plaintiffs are from other states such as California, New Jersey, and New York.

cannot invoke arbitration because it (unlike Robinhood Derivatives) was not signatory to any arbitration agreement. Having considered the parties' filings as well as the oral argument of counsel the Court hereby **DENIES** Robinhood's motion to compel arbitration.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. *Chehal* Complaint

Previously, the Court consolidated four cases that had been filed against Robinhood and appointed interim counsel. *See* Docket No. 45 (order). The parties agreed that the issue of arbitration should be adjudicated before Plaintiffs had to file a consolidated amended complaint. *See* Docket No. 47 (minutes, filed on 7/17/2026). Accordingly, in this section, the Court provides a summary of the allegations made in the lowest-numbered case only (*Chehal*).

As alleged in *Chehal*, Robinhood offers commission-free stock trading. *See* Chehal Compl. ¶ 22. In October 2024, Robinhood began selling "event contracts." *See* Chehal Compl. ¶ 2.

> According to Robinhood, "[a]n event contract is a type of financial derivative that allows traders to speculate on a specific event. These contracts are generally structured around 'Yes' or 'No' positions, and fluctuate in price based on the projected occurrence of the event. Event contracts then pay out if the position held matches the correct occurrence of the event; otherwise, they expire with no value." Event contracts are priced between one cent and 99 cents with each cent representing a 1% probability of the event occurring. As described by Robinhood, "if a contract is priced at 53 cents, this can be interpreted as a 53% probability that it will occur according to that market."

Chehal Compl. ¶ 3. The Commodity Futures Trading Commission considers an event contract a kind of derivative – *i.e.*, a "financial contract[] that derive[s] [its] value from an underlying commodity. In the case of event contracts, this would be the outcome of an event." https://www.cftc.gov/LearnandProtect/PredictionMarkets (last visited 11/24/2026).

In March 2025, Robinhood began to facilitate the sale of sports event contracts specifically to Robinhood customers. The sports event contracts were listed by a third party, Kalshi, Inc., on its designated contract market or "DCM." Robinhood allowed its customers to trade sports event contracts using its "Prediction Markets Hub," for which Robinhood charged a commission for each contract traded. *See* Chehal Compl. at 3 n.3; Chehal Compl. ¶¶ 1, 4, 27, 33.



United States District Court
Northern District of California

United States District Court
Northern District of California

Customers are "led to believe that sports event contracts are a modern, sophisticated form of investing on a federally regulated commodities exchange" (*i.e.*, a DCM), but, "[i]n reality, the sports event contracts Robinhood sells are old-fashioned wagers on the outcomes of sporting events (i.e., gaming)," Chehal Compl. ¶ 1 – even though Robinhood (as well as Kalshi) is not licensed by any state gambling authority. *See also* Chehal Compl. ¶ 5 (alleging that "Robinhood creates a misleading impression either actively or by omission that Kalshi's prediction markets have the approval of state gambling control authorities and are legal when, in fact, they do not and are illegal under state law"). In other words, Robinhood has "repackag[ed] sports wagers as event contracts, [but] these offerings are nothing more than unlawful online sports bets."[2] Chehal Compl. ¶ 48. Notably, "Robinhood enables customers to place gaming wagers against margin on their securities portfolios, exposing customers to the loss of their securities portfolios through unregulated and potentially compulsive gaming activities." Chehal Compl. ¶ 38.

Although Robinhood has been enabling the trading of Kalshi's sports event contracts, it has also taken action to invest in companies that will allow it "to operate prediction markets independently of Kalshi." Chehal Compl. ¶ 31.

Based on, *inter alia*, the above allegations, Plaintiffs have brought a class action against Robinhood, claiming violations of state gambling law,[3] state consumer protection law, and state common law (unjust enrichment).

/ / /

/ / /

---

[2] Apparently, Robinhood has tried to distinguish trading in sports event contracts from sports betting. *See* Chehal Compl. ¶ 28 (alleging that Robinhood has stated: "'Unlike sports betting, where the firm sets a line, event contracts leverage the power and rigor of financial market structure and are offered in a marketplace where buyer and sellers interact to set the price'").

[3] *See* Chehal Compl. ¶ 59 ("Several states, including New Jersey, New York, and Michigan allow individuals to recover funds lost in connection with an illegal gambling operation from any 'winner,' 'stakeholder,' or 'person' who received their wagers under state laws modeled after the Statute of Anne – a British law passed in 1710 during the reign of Queen Anne that made certain gambling debts unenforceable."). *See, e.g.*, Chehal Compl. ¶¶ 94, 99 (in Count 3, alleging that Robinhood did not have a New Jersey license for gambling and that "Plaintiff Levi and the New Jersey Subclass wagered and lost money on Robinhood's platform, which was falsely represented as lawful and in compliance with regulations").

B. Cases Involving Kalshi

The instant case is not the first case involving claims that the sports event contracts offered by Kalshi constitute sports gambling. For purposes of the instant case, the Court focuses on a recent Ninth Circuit decision, *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 U.S. App. LEXIS 26395 (9th Cir. Aug. 28, 2026).

In *KalshiEX v. Assad*, Kalshi brought suit after the Nevada Gaming Control Board sent the company a cease-and-desist letter, notifying Kalshi that it was violating Nevada statutes and gaming regulations. *See id.* at *11. Kalshi sought a preliminary injunction to prevent Nevada from regulating the trading of sports (and election) event contracts on its designated contract market. *See id.* at *16-17. The district court initially granted Kalshi's motion but later dissolved the preliminary injunction. Kalshi appealed to the Ninth Circuit.

The Ninth Circuit began its opinion by providing background on event contracts. "A futures contract is a 'standardized agreement' to buy or sell a 'commodity' in the future for a price determined at the contract's inception." *Id.* at *12. "In the nineteenth and early twentieth centuries, futures markets . . . developed to allow the 'purchase or sale of a futures contract' and the ability to hedge against risks associated with these price fluctuations in agricultural markets, such as grain." *Id.* Recognizing that futures contracts were susceptible to, *e.g.*, speculation and manipulation, Congress passed the Grain Futures Act of 1922 which gave the Secretary of Agriculture authority to supervise trading in grain futures on designated contract markets, also known as "DCMs." Congress subsequently changed the name of the statute to the Commodity Exchange Act ("CEA"). *See id.* at *13.

In the 1970s, Congress amended the CEA to include nonagricultural commodities and authorized a new agency – the Commodity Futures Trading Commission ("CFTC") – to take over regulation. *See id.* The CFTC was given exclusive jurisdiction over certain derivatives. "A derivative is a 'financial instrument whose value depends on or is derived from the performance of a secondary source, such as an underlying bond, currency, or commodity." *Id.*

In 2010, Congress enacted the Dodd-Frank Act, which, among other things, amended the CEA.

> Dodd-Frank amended the CEA in three relevant ways. First, it added "swaps" to the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A).[[4]] It outlined an extensive, six-part definition of "swap" as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."[[5]] § 1a(47)(A)(ii). Second, the Dodd-Frank amendments made it "unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a [DCM]." § 2(e). And third, it gave the CFTC the power to "determine" that certain swaps are "contrary to the public interest" and therefore cannot be listed on a DCM, if the swap involves "activity that is unlawful under any Federal or State law, terrorism, assassination, war, *gaming*, or other similar activity. . . ." § 7a-2(c)(5)(C)(i)-(ii) (cleaned up) (emphasis added).
>
> Soon after, the CFTC adopted a regulation categorically prohibiting swaps based on "an excluded commodity," that "involves, relates to, or references," among other things, "gaming." 17 C.F.R. § 40.11(a). Despite this prohibition, an excluded commodity may be offered because a DCM can self-certify to the CFTC in a "written certification" that "any new contract" complies with the CEA and CFTC regulations. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. §38.4(b). Once the self-certification is filed, the DCM can begin offering the new contract the next business day. 17 C.F.R. § 40.2(a)(2); 7 U.S.C. § 7a-2(c)(1)-(2). But "if a DCM nevertheless lists a contract that involves an enumerated activity or something similar . . . the CFTC may review it" and disallow it. *KalshiEX v. Hendrick*, 817 F. Supp. 3d 1014, 1036 n.13 (D. Nev. 2025) (*Hendrick II*); *see* 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11(c).

---

[4] Section 2(a)(1)(A) provides that the CFTC has "exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery . . . , traded or executed on a contract market designated pursuant to section 7 of this title . . . ." 7 U.S.C. § 2(a)(1)(A); *see also id.* § 7 (designation of boards of trade as contract markets – *i.e.*, DCMs). Before Dodd-Frank, "swaps were originally traded almost entirely in unregulated 'over-the-counter' markets." *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087, at *3 (6th Cir. Sept. 25, 2026).

[5] The Sixth Circuit has explained swaps as follows.

> Swaps are "financial contracts in which two counterparties agree to exchange or 'swap' payments with each other as a result of such things as changes in a stock price, interest rate or commodity price." Swaps allow parties with exposure to particular risks . . . to mitigate the risk, of that exposure by hedging against fluctuations in the price of whatever underlies the swap. . . . In short, a "swap" is a transaction where two parties agree to exchange payments to mitigate financial risk.

*KalshiEX LLC v. Schuler*, 2026 WL 2884087, at *2.



United States District Court
Northern District of California

*Id.* at *14-15.

Kalshi is a DCM. *See id.* at *15; *see also* https://www.cftc.gov/IndustryOversight/TradingOrganizations/DCMs/index.htm (last visited 11/24/2026) (stating that DCMs are "boards of trade (or exchanges) that operate under the regulatory oversight of the CFTC"; "DCMs are most like traditional futures exchanges, which may allow access to their facilities by all types of traders, including retail customers," and "may list for trading futures or option contracts based on any underlying commodity, index or instrument").

> In January 2025, Kalshi self-certified to the CFTC, and began offering . . . sports event contracts. On Kalshi's DCM, individuals can buy and sell contracts based on [*e.g.*] who will win the Super Bowl . . . . Kalshi's contracts also allow individuals to essentially place prop bets – bets based on outcomes within a game, such as over-under, score-specific spreads – and parlays (or "combos"), where users can link their trades for a larger payout if each leg hits.

*Id.* at *15-16.

On appeal, the issue before the Ninth Circuit was whether the district court had properly dissolved the preliminary injunction that had prevented Nevada from regulating the trading of sports (and election) event contracts on Kalshi's DCM. Kalshi had taken the position that Nevada could not regulate because of preemption: express, conflict, and field.

For purposes of the instant case, the most significant part of the court's preemption analysis concerned express preemption. Kalshi claimed express preemption because the CEA contains a provision stating that "[t]he [CFTC] shall have **exclusive jurisdiction** . . . with respect to accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery . . . , traded or executed on a [DCM] . . . ." 7 U.S.C. § 2(a)(1)(A) (emphasis added). The critical issue was whether a sports event contract is a "swap" under the CEA. If a sports event contract is a swap, then it would fall under the CFTC's exclusive jurisdiction. *See id.* at *27.

According to Kalshi, a sports event contract is a swap because one of the six definitions of swap in the CEA, *see* 7 U.S.C. § 1a(47)(A)(ii), is "'any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence,



United States District Court
Northern District of California

nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.'" *KalshiEX v. Assad*, 2026 U.S. App. LEXIS 26395, at *27. Kalshi argued for a broad interpretation of this provision, but the Ninth Circuit rejected that argument.

The court first questioned Kalshi's contention that "event," as used in the statute, simply means something that happens. "[W]hile the word 'event' can be defined as 'occurrence,' that definition may not always correspond to its ordinary public meaning. And because the statutory definition of swap uses *both* event and occurrence, these words should have independent meaning to avoid rendering one term superfluous." *Id.* at *29 (emphasis added). The Ninth Circuit thus considered the statutory context to determine the parameters of what a swap is under § 1a(47)(A)(ii). *See id.* at *29-30 ("'The statute's language, structure, subject matter, context, and history are all factors that typically help courts determine a statute's objectives and thereby illuminate its text.' This is particularly true when, as here, competing reasonable interpretations of the same statutory text exist.").

The Ninth Circuit pointed out that "[t]he relevant backdrop [for that provision in the CEA] includes legislation involving gambling, which weighs against giving the words in § 1a(47)(A)(ii) the broadest possible reading because, as discussed below, Kalshi's sports event contracts have the hallmarks of sports betting." *Id.* at *30. Because Kalshi was essentially offering sports betting – "a quintessential form of gambling" – "[i]t is difficult . . . to conclude that Congress intended to upend its decades of careful regulation of gambling based on broad definitions of the words used in a Wall Street Reform Bill." *Id.* at *30-31; *see also id.* at *45-46 ("Dodd-Frank . . . cannot be read as a direct (or indirect) regulation of sports gambling, and the CFTC is not a national gambling regulator. . . . 'If an agency wants to exercise expansive regulatory authority over' a major issue like gambling, 'an *ambiguous* grant of statutory authority is not enough.'") (emphasis in original).

The Ninth Circuit further noted that the other definitions of swap in § 1a(47)(A) weighed against a broad interpretation of the specific definition on which Kalshi relied. *See id.* at *33-34 ("The accompanying words in the CEA's definition of swap in § 1a(47)(A) include 'any



United States District Court
Northern District of California

agreement, contract, or transaction' that provides for the exchange of payments 'based on the value or level of . . . interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind . . . and that transfers, as between the parties to the transaction . . . the financial risk associated with a future change in any value or level . . .' § 1a(47)(A)(iii). Kalshi's sports event contracts are unlike these transactions. As Nevada points out, Kalshi's sports event contracts do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers, where none previously existed.") (emphasis in original). In addition, Kalshi's broad interpretation of swap "lacks a limiting principle. Kalshi's broad interpretation of the definition of swap encompasses *off*-DCM transactions, yet the CEA makes it *unlawful* to enter into 'swaps' outside of a DCM." *Id.* at *35 (emphasis added). Under Kalshi's position, "anyone who places an off-DCM sports bet that falls within § 1a(47)(A)(ii)'s definition of swap would be violating the CEA." *Id.* at *36.

According to Kalshi, the "lack of a limiting principle is solved by the additional language in § 1a(47)(A)(ii)'s definition of swap, which requires that 'the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency' be '*associated with a potential financial, economic, or commercial consequence*.'" *Id.* at *37 (emphasis in original). However, the Ninth Circuit was not persuaded, agreeing with the district court that "'associated with' as used in § 1a(47)(A)(ii) 'means that the event or contingency must be *inherently* associated with a potential financial [or economic] consequence, not just that the event or contingency have some potential downstream financial consequence.'" *Id.* at *38 (emphasis added). "[R]eading the statute so expansively as to include any conceivable downstream economic consequence would render the definition of swap so broad as to be meaningless." *Id.* at *39.

Kalshi argued still that another provision in the CEA established that the CFTC – and not the 50 states – was given exclusive jurisdiction over sports event contracts, even if they involved gaming. *See* 7 U.S.C. § 7a-2(c)(5)(C). Section 7a-2(c)(5)(C) is titled "Special rule for review and approval of event contracts and swaps contracts." The "Special Rule" provides in relevant part:

/ / /



United States District Court
Northern District of California

> In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . , by a designated contract market or swap execution facility, the Commission **may** determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve –
>
> (I) activity that is unlawful under any Federal or State law;
>
> (II) terrorism;
>
> (III) assassination;
>
> (IV) war;
>
> (V) **gaming**; or
>
> (VI) other similar activity determined by the [CFTC], by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i) (emphasis added). But again, the Ninth Circuit was not moved. The court pointed out that there was a regulation, 17 C.F.R. § 40.11, which provides that "'[a] registered entity *shall not* list for trading . . . [a]n agreement, contract, transaction or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references . . . gaming.'" *KalshiEX v. Assad*, 2026 U.S. App. LEXIS 26395, at *40 (emphasis in original); *see also* 7 U.S.C. § 7a-2(c)(5)(C)(ii) ("No agreement, contract, or transaction determined by the [CFTC] to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity."). "Until § 40.11(a) is amended in the manner described in the [CFTC's Notice of Proposed Rulemaking], it bars Kalshi's gaming-related contracts from being listed on a DCM." *KalshiEX v. Assad*, 2026 U.S. App. LEXIS 26395, at *42. The court added: "The Special Rule did not give the CFTC any more preemptive authority over gaming than it gave the CTFC authority over terrorism or assassination and the other underlying 'excluded commodities.'"[6] *Id.* at *42-43.

/ / /

[6] After rejecting express preemption, the Ninth Circuit addressed conflict and field preemption. It held that neither kind of preemption applied to the case under consideration.

United States District Court
Northern District of California

*KalshiEX v. Assad* is a significant decision for the instant case. Although the Ninth Circuit was dealing with only a preliminary injunction, not the final merits, the case undercuts any suggestion by Robinhood in the case at bar that the state gambling laws on which Plaintiffs rely are preempted by the CEA.[7] While, admittedly, the Court is not being tasked with any merits evaluation at this point in the proceedings, *KalshiEX v. Assad* still has relevance to the pending motion because Plaintiffs have argued that, if there was an agreement to arbitrate, the scope of the agreement covered only derivatives governed by the CEA and/or regulated by the CFTC, and not gambling contracts which do not fall within the exclusive jurisdiction of the CFTC. In short, *KalshiEX v. Assad* recognizes a distinction between conventional (*e.g.*, commodity) swaps and gambling.

C. <u>Arbitration Agreement</u>

In support of its motion to compel arbitration, Robinhood has provided evidence regarding its arbitration agreement. That evidence reflects as follows.

Robinhood Derivatives (the subsidiary of Robinhood Markets) is a futures commission merchant. It provides eligible users with access to the trading of derivatives on exchanges regulated by the CFTC. Among the derivatives that Robinhood Derivatives makes available are event contracts. *See* Martin Decl. ¶ 2.

In order to set up a Robinhood Derivatives account for trading derivatives, including event contracts, a customer must do two things:

---

[7] To be clear, there are other courts that have reached the same conclusion as the Ninth Circuit and for similar reasons, *see KalshiEX v. Schuler*, 2026 WL 2884087 (Sixth Circuit) (denying Kalshi's motion for a preliminary injunction), but some have disagreed. Most notably, a few weeks before the Ninth Circuit's decision in *KalshiEx v. Assad*, the Third Circuit held in Kalshi's favor when Kalshi sought to preliminarily enjoin the New Jersey Division of Gaming Enforcement from enforcing state law against the company's sports-related event contracts. *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 224 (3d Cir. 2026) (concluding that "Kalshi has demonstrated a reasonable chance of success on its argument that the [CA] preempts otherwise applicable state law"). The state of New Jersey has petitioned the Supreme Court for review.

The Second and Fourth Circuits have pending cases but have not issued decisions yet. *See KalshiEx LLC v. Cafferelli*, No. 25-cv-2016, 2026 WL 2294589 (D. Conn. Aug. 10, 2026) (denying Kalshi's motion for preliminary injunction), *appeal docketed*, No. 26-2239 (2d Cir. Aug. 12, 2026); *KalshiEx LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) (denying Kalshi's motion for a preliminary injunction), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025).

(1) enter into a Futures Client Agreement with Robinhood Derivatives[8]; **and**

(2) agree or disagree to an arbitration agreement.[9]

*See* Martin Decl. ¶¶ 3-4. Users who do not agree to arbitration may still set up accounts with Robinhood Derivatives and trade derivatives "in the same manner as users who executed the Arbitration Agreement." Martin Decl. ¶ 7. This optionality is a requirement of federal law. *See* 17 C.F.R. § 166.5(c)(1) ("No [CFTC] registrant shall enter into any agreement or understanding with a customer in which the customer agrees, prior to the time a claim or grievance arises, to submit such claim or grievance to any settlement procedure except as follows: (1) Signing the agreement must not be made a condition for the customer to utilize the services offered by the [CFTC] registrant.").

When the user is presented with the arbitration agreement, the agreement is "presented as a separate document on its own screen that [an] individual[] must navigate past in order to create an account." Martin Decl. ¶ 4. Only the text of the arbitration agreement is presented to the user (*i.e.*, not other information as well). The user can scroll down to view the entire agreement. *See* Martin Decl. ¶ 5.

Below are screenshots of "the arbitration agreement screen **as it currently appears**" to mobile phone users. Martin Decl. ¶ 5 (emphasis added).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8] Exhibits A-D attached to the Martin Declaration are copies of the respective Futures Client Agreements in effect when the 10 Plaintiffs at issue signed up for their accounts.

[9] Exhibit E attached to the Martin Declaration is the arbitration agreement (titled "Futures Arbitration Agreement") that was in effect when 9 of the 10 Plaintiffs at issued signed up for their accounts. Exhibit F is the arbitration agreement (titled "Robinhood Derivatives Arbitration Agreement") that was in effect when 1 of the 10 Plaintiffs at issued signed up for his account.







Martin Decl. ¶ 5 & Ex. G. Desktop users are shown a similar screen. *See* Martin Decl. ¶ 5 & Ex. G.

According to Robinhood,

> [t]he presentation of the Arbitration Agreement in these screenshots [reflecting the arbitration agreement screen **as it currently appears**] is **materially the same** as it appeared to users **when Plaintiffs signed up for their accounts** on Robinhood Derivatives. Users were presented with the operative terms of the Arbitration Agreement, with the first paragraph of the agreement immediately visible on the screen. The title "RHD arbitration agreement" was shown at the top of the screen. And users were presented with the same options to "Agree" or to "Continue without agreeing." Only by selecting one of those options could a user create an account with Robinhood Derivatives.

Martin Decl. ¶ 6 (emphasis added).

As indicated above, the arbitration agreements in effect at the time the 10 Plaintiffs signed up for their accounts with Robinhood Derivatives can be found at Exhibits E and F to the Martin Declaration. Because the arbitration agreement at Exhibit E applies to most of the Plaintiffs at

United States District Court
Northern District of California

issue (9 out of 10), the Court focuses on that agreement. The agreement provides in relevant part as follows:

> Any controversy or claim arising out of or relating to my futures account, transactions with Robinhood Derivatives, LLC pursuant to the Futures Client Agreement between us or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the National Futures Association, or the contract market upon which the transaction giving rise to the claim was executed. After receipt of notice from Client that Client intends to submit a controversy to arbitration, or at the time Robinhood Derivatives, LLC notifies Client that it intends to submit a controversy to arbitration, Robinhood Derivatives, LLC will provide Client with a list of qualified forums.
>
> A "qualified forum" is an organization whose procedures for conducting arbitrations meet Acceptable Practices established by the Commodity Futures Trading Commission ("CFTC"). . . .
>
> . . . .
>
> CFTC rules require the inclusion of the following notice in this agreement:
>
> **THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION (CFTC), AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION.**
>
> **. . . .**
>
> **BY SIGNING THIS AGREEMENT, YOU: (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU OR ROBINHOOD DERIVATIVES, LLC MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE THAT MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF ROBINHOOD DERIVATIVES, LLC INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND YOU PREFER TO REQUEST A SECTION 14 "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION.**

> **YOU NEED NOT SIGN THIS AGREEMENT TO OPEN OR MAINTAIN AN ACCOUNT WITH ROBINHOOD DERIVATIVES, LLC. SEE 17 CFR 166.5.**

Martin Decl., Ex. E (Futures Arbitration Agmt.) (emphasis in original); *see also* 17 C.F.R. § 166.5(c)(7) (providing that an arbitration agreement must contain the cautionary language in bold above).

The arbitration agreement at Exhibit F is largely similar to the arbitration agreement at Exhibit E, except Exhibit F also contains at the end a section regarding waiver of class/collective actions. The section states:

> **TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER CLIENT NOR COVERED PARTIES SHALL BE ENTITLED TO ARBITRATE OR LITIGATE ANY DISPUTE IN A REPRESENTATIVE CAPACITY. CLIENT MAY ONLY ARBITRATE OR LITIGATE ON AN INDIVIDUAL CLAIMS BASIS ONLY AND FOR YOUR OWN LOSSES ONLY. UNDER THIS AGREEMENT, CLIENT MAY NOT PROCEED IN ARBITRATION OR COURT AS A CLASS REPRESENTATIVE, MEMBER OR PART OF ANY PROPOSED CLASS, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL SUIT, QUI TAM ACTION OR ANY REPRESENTATIVE PROCEEDING, OR OTHERWISE SEEK TO RECOVER ON BEHALF OF OTHERS OR FOR THE BENEFIT OR USE OF OTHERS IN ANY TYPE OF CLAIM OR ACTION. CLIENT AND COVERED PARTIES ARE EACH WAIVING RESPECTIVE RIGHTS TO PARTICIPATE IN A CLASS ACTION. BY ACCEPTING THIS AGREEMENT, YOU GIVE UP YOUR RIGHT TO PARTICIPATE IN ANY PAST, PRESENT OR FUTURE CLASS ACTION OR ANY OTHER CONSOLIDATED OR REPRESENTATIVE PROCEEDING, INCLUDING ANY PROCEEDING EXISTING AS OF THE DATE CUSTOMERS AGREED TO THIS AGREEMENT.**

Martin Decl., Ex. F (Robinhood Derivatives Arbitration Agreement) (emphasis in original).

D. Plaintiffs' Declarations

The 10 Plaintiffs at issue have each submitted a declaration in opposition to the motion to compel arbitration. The declarations contain testimony to support Plaintiffs' contention that agreements to arbitrate did not exist between them and Robinhood. For example, the 10 Plaintiffs all make the following statements:

/ / /



United States District Court
Northern District of California

- "I searched my files, both in my email address on file with Robinhood and within my Robinhood account, and did not find any record of Robinhood having sent me a copy of an arbitration agreement to which I purportedly agreed, or any invitation to opt out of arbitration thereafter." *See, e.g.*, Chehal Decl. ¶ 7.
- "I have reviewed the screenshots [of the mobile app and desktop screens] attached as Exhibit G to the [Martin Declaration]. I cannot confirm that the screen shown in Exhibit G is the same screen, or is presented in the same manner, as anything displayed to me during the sign-up process . . . ." *See, e.g.*, Chehal Decl. ¶ 8.
- "I do not recall being required to scroll through the entirety of any page presented to me before being given any option to click 'Agree' or 'Continue without agreeing.'" *See, e.g.*, Chehal Decl. ¶ 9.

In addition, some of the 10 Plaintiffs dispute the information purportedly contained in Robinhood's records, which provide, *e.g.*, dates and locations for the agreements to arbitrate.

## II. DISCUSSION

### A. Legal Standard

The parties do not dispute that the FAA governs the case at bar. Under the FAA, in a "contract evidencing a transaction involving commerce," any written provision "to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." 9 U.S.C. § 2.

The FAA requires courts to "enforce arbitration agreements according to their terms." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). It "limits the court's role to deciding whether: (1) 'a valid agreement to arbitrate **exists'** between the parties and (2) the **scope** of the agreement encompasses the claims." *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th 2024) (emphasis added).

### B. Whether Agreement to Arbitrate Exists

Robinhood has the burden of proving – by a preponderance of the evidence – that an agreement to arbitrate exists. *See Norcia v. Samsung Telcoms. Am., LLC*, 845 F.3d 1279, 1283

(9th Cir. 2017) ("As the party seeking to compel arbitration, [the defendant] bears 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'"). Whether there was an agreement to arbitrate is determined by state law. *See Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 476 (9th Cir. 2024) ("'In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation.'"). In the instant case, both parties have looked to California law, even though other states' laws are also implicated given that Plaintiffs are from various states. *See* Opp'n at 12 n.10 ("Plaintiffs have identified no relevant difference between the laws of Plaintiffs' various states of residence with regard to contract formation in this context."); Reply at 2 n.1 ("Plaintiffs brief all issues under California law. Robinhood responds in kind for purposes of this reply and reserves all choice-of-law arguments."). Because the parties have focused on California law, the Court does the same.

As indicated above, Robinhood has provided evidence that there were agreements to arbitrate between it and 10 (out of 11) Plaintiffs. Plaintiffs argue that Robinhood has failed to prove by a preponderance of the evidence that there were arbitration agreements for three reasons: (1) Robinhood's evidence does not show what screens Plaintiffs *actually* saw when they purportedly agreed to arbitrate; (2) even accepting Robinhood's evidence, Robinhood has failed to show that Plaintiffs were given sufficient notice of the arbitration agreements and that Plaintiffs unambiguously assented; and (3) for some Plaintiffs, Robinhood's records as to when they purportedly agreed to arbitrate have problematic dates and locations.

1. <u>Evidence of What Plaintiffs Saw</u>

Robinhood has provided evidence that, to sign up a Robinhood Derivatives account for trading derivatives, including event contracts, a customer must agree or disagree to an arbitration agreement. When the user is presented with the arbitration agreement, the agreement is "presented as a separate document on its own screen that [an] individual[] must navigate past in order to create an account." Martin Decl. ¶ 4. Only the text of the arbitration agreement is presented to the user (*i.e.*, not other information as well). The user can scroll down to view the entire agreement. *See* Martin Decl. ¶ 5.

Below are screenshots of "the arbitration agreement screen **as it currently appears**" to mobile phone users. Martin Decl. ¶ 5 (emphasis added).







Martin Decl. ¶ 5 & Ex. G (screenshots). There is a similar arbitration agreement screen for desktop users. *See* Martin Decl. ¶ 5 & Ex. G. (But most of the 10 Plaintiffs seem to have signed up using mobile phones. *See* Martin Decl. ¶ 10.)

According to Robinhood,

> [t]he presentation of the Arbitration Agreement in these screenshots [reflecting the arbitration agreement screen as it currently appears] is **materially the same** as it appeared to users when Plaintiffs signed up for their accounts on Robinhood Derivatives. Users were presented with the operative terms of the Arbitration Agreement, with the first paragraph of the agreement immediately visible on the screen. The title "RHD arbitration agreement" was shown at the top of the screen. And users were presented with the same options to "Agree" or to "Continue without agreeing." Only by selecting one of those options could a user create an account with Robinhood Derivatives.

Martin Decl. ¶ 6 (emphasis added).

/ / /

United States District Court
Northern District of California

Plaintiffs argue that the above is not sufficient evidence as to what was *actually* displayed to them. Plaintiffs contend that "a perfunctory statement that the presentation of the Agreement in the screenshots is 'materially the same' as it appeared to Plaintiffs is insufficient." Opp'n at 11.

Plaintiffs are correct that, "[w]hen [the defendant] asserts that [the plaintiff] agreed to a web-based arbitration agreement, evidence regarding *what the [plaintiff] saw* and how assent to agreements was manifested is key information." *O'Connell v. Celonis, Inc.*, No. 22-cv-02320-WHO, 2022 U.S. Dist. LEXIS 150484, at *30 (N.D. Cal. Aug. 22, 2022) (emphasis added); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) ("Unless the website operator can show that a consumer has actual knowledge of the [arbitration] agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) *the website provides reasonably conspicuous notice of the terms to which the consumer will be bound*; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.") (emphasis added).

And courts have found, in certain instances, that the evidence presented by the defendant regarding what the plaintiff saw was insufficient. For example, in *O'Connell*, the evidence submitted by the defendant was clearly insufficient because the defendant failed to provide any "declarations to support [its] allegations and arguments [as to what the plaintiff saw] from any person with knowledge at [the defendant or its affiliated company]. Instead, its attorneys make assertions in the brief and then attach [one of the company's terms and conditions agreement] to their declarations." *Id.* at *7; *see also id.* at *28 (noting that defendant "provided no evidence from anyone with personal knowledge that supports its assertions that [the defendant and the affiliated company] had an agreement as co-employers at the relevant time or that the [affiliated company's terms and conditions agreements] provided to the court by litigation counsel were the [terms and conditions agreements] accessible to and/or provided to new . . . employees [of the defendant] during the relevant time period").

The evidence offered by the defendant in *Dawson v. Target Corp.*, No. 3:24-cv-08167-AMO, 2025 U.S. Dist. LEXIS 111315 (N.D. Cal. June 11, 2025), *vacated on other grounds by* No. 25-4061, 2026 U.S. App. LEXIS 24549 (9th Cir. Aug. 14, 2026), was also clearly deficient.

> With respect to Target's account creation process, Target provides no evidence as to what this process looked like when Plaintiff Dawson first created his Target account *in 2014*. Instead, the Yem Declaration submits an undated account creation screenflow, which Yem attests has been the similar screen *since October 2022*. There is no evidence in the record – because Defendants provide none – that Target even had an arbitration agreement in its Terms and Conditions in 2014, let alone that Plaintiff Dawson agreed to them at that time. Target cannot rely on screenflows from 2022 to prove consent in 2014.

*Id.* at *4-5 (emphasis omitted and added).

The instant case, however, is clearly distinguishable from both *O'Connell* and *Dawson*. Here, Robinhood has provided a declaration from an *employee* regarding the web-based arbitration agreement and the process to enter into it. Also, Robinhood has explained that, even though the screenshots provided are *current* ones, the "[t]he presentation of the Arbitration Agreement in these screenshots is *materially the same* as it appeared to users when Plaintiffs signed up for their accounts on Robinhood Derivatives." Martin Decl. ¶ 6 (emphasis added). Notably, several courts in this District have found similar evidence sufficient. *See, e.g.*, *Cheng v. Nordstrom, Inc.*, No. 26-cv-02431-CRB, 2026 U.S. Dist. LEXIS 195419, at *8 (N.D. Cal. Aug. 28, 2026) (rejecting "Cheng's repeated argument that Nordstrom's evidence is insufficient, because it consists only of 'exemplars' and not 'the screen Ms. Cheng actually saw'"; "Nordstrom's uncontradicted evidence is the type courts routinely accept"); *Singh v. Adobe Inc.*, 797 F. Supp. 3d 1038, 1045-46 (N.D. Cal. 2025) (Corley, J.) (concluding that "Adobe has satisfied its burden of demonstrating what Nunez and Brooke would have seen when they signed up in October and November 2024"; Adobe submitted a the Naseer Declaration which stated that "the screenshots attached to [Ms. Naseer's] prior declarations are 'substantially identical' to what they would have experienced when they signed up for their respective subscriptions"); *Bugarin v. All Nippon Airways Co.*, No. 20-cv-03341-BLF, 2021 U.S. Dist. LEXIS 206502, at *9-10 (N.D. Cal. Oct. 26, 2021) (finding defendant met its burden because of two declarations: (1) the Vazan Declaration "describes the process by which an individual can use the ASAP website to purchase an airline ticket" and "states that the screen flow on the ASAP website, the booking screen, and the terms and conditions have not changed in any material respect since Bugarin purchased her airline tickets in November



United States District Court
Northern District of California

2019," and (2) an attorney declaration provided information about the attorney's experience purchasing a ticket in February 2021).

Based on the evidence provided by Robinhood, there is at least a prima facie case of what Plaintiffs saw at the time of creating their Robinhood Derivatives accounts, and Plaintiffs have not offered any real evidence in rebuttal. Plaintiffs' declarations simply state: "I have reviewed the screenshots attached as Exhibit G to the [Martin Declaration]. **I cannot confirm** that the screen shown in Exhibit G is the same screen, or is presented in the same manner, as anything displayed to me during the sign-up process . . . ." *See, e.g.*, Chehal Decl. ¶ 8 (emphasis added). But that is not a denial from Plaintiffs; at best, they simply state they do not recall. This is not true rebuttal evidence. Absent a true rebuttal, Robinhood's evidence establishes by a preponderance of the evidence as to what the 10 Plaintiffs at issue saw. *See Singh*, 797 F. Supp. 3d at 1046 (noting that "Nunez and Brooke neither dispute that the screenshots offered by Ms. Naseer are the same as what they saw nor offer any evidence regarding what they saw; rather, they attest they cannot recall what they saw" but this is not sufficient to overcome the evidence of assent).

2. <u>Inquiry Notice</u>

Plaintiffs contend that, even if the Court accepts Robinhood's evidence as to what they saw, they still cannot be bound by the agreements absent a showing they had actual notice or at least inquiry notice of the agreements. Because actual notice is difficult to prove, parties – and courts – typically focus on inquiry notice. That is the case here.

Under Ninth Circuit law, "an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856.

Plaintiffs' arguments that there is an insufficient showing of inquiry notice lack merit.

a. <u>Reasonably Conspicuous Notice</u>

In *Berman*, there was an issue regarding reasonably conspicuous notice because all the defendant did was provide a statement on its website (in "tiny gray font") that



United States District Court
Northern District of California

> "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy." The underlined phrases "Terms and Conditions" and "Privacy Policy" were hyperlinks, but they appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink. If [the plaintiff] had seen the "Terms & Conditions" hyperlink, she would have been taken to a separate webpage displaying a lengthy set of legal provisions, one of which stated that any disputes related to telemarketing calls or text messages received from Fluent or its marketing partners would have to be resolved through arbitration.

*Id.* at 854.

The Ninth Circuit held that the defendant's webpage did not provide reasonably conspicuous notice of the terms and conditions because the text disclosing the existence of the terms and conditions was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye." *Id.* at 856-57. In addition, "while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent." *Id.* at 857.

In the instant case, Plaintiffs argue that the agreement to arbitrate was not reasonably conspicuous because Robinhood's mobile apps (which most seem to have used to set up their Robinhood Derivatives accounts, *see* Martin Decl. ¶ 10 & Ex. H (business records)) "concealed key terms" of the arbitration agreement: the phone screen did not show the *entirety* of the agreement on one screen. Opp'n at 13 (arguing that the "mobile app apparently displayed only a subset of the Agreement"). "[T]he font-size and line-spacing choices Robinhood implemented on its mobile app result in no more than the first two paragraphs of the Arbitration Agreement appearing above the action buttons," and, "[a]s Plaintiffs attest [in their declarations], this two-paragraph subset appears to constitute the entirety of the Agreement." Opp'n at 13. *See, e.g.*, Chehal Decl. ¶ 10 ("While I **cannot recall** the sign-up screens . . . , [b]ased on the presentation of the sign-up screen in this depiction, including button placement, **I . . . believe I would have thought** that it shows a complete, two-paragraph agreement and that there were no additional terms for me to review.") (emphasis added). Plaintiffs add that they were not required to scroll down to view the entire agreement before clicking on one of the action buttons ("Agree" or "Continue without agreeing"). *See, e.g.*, Chehal Compl. ¶ 9 ("I do not recall being required to



United States District Court
Northern District of California

scroll through the entirety of any page presented to me before being given any option to click 'Agree' or 'Continue without agreeing.'").

Plaintiffs' position is not convincing for several reasons. First, the situation here is clearly different from that in *Berman*. In *Berman*, the terms and conditions – which included an arbitration provision – were essentially buried on the defendant's webpage, and even within the terms and conditions, the arbitration provision was buried. Here, the Robinhood user was presented with the arbitration agreement on its own screen, separate and apart from any other information.

Second, nothing in *Berman* suggests that inquiry notice requires that a plaintiff immediately be presented with every single term in an arbitration agreement as opposed to a plaintiff simply being aware that there is an agreement to arbitrate. As Robinhood argues, "Plaintiffs' position . . . would apparently invalidate any arbitration agreement that does not fit on a phone screen." Reply at 4. And here, the very first sentence that was shown on the screen stated that disputes would be resolved by arbitration.

Third, Plaintiffs' contention that a user would believe (as, evidently, Plaintiffs post-hoc believe) there were only two paragraphs in the arbitration agreement based on the screen they were shown is unavailing. Just because Plaintiffs were not *required* to scroll down does not mean they were *unable* to scroll down and/or that something *misled* them into believing that there was nothing more to see. In this regard, the Court takes note that one of the mobile phone screenshots provided by Robinhood has the second paragraph of the agreement cut off; thus, there would be an incentive to scroll down if the user wanted to read more of the agreement. (Desktop users also seem to have been presented with a "cut-off.") Ultimately, the issue raised by Plaintiffs here goes more to unconscionability, not whether Plaintiffs were put on inquiry notice that there was an arbitration agreement.

The authorities cited by Plaintiffs are not to the contrary. In *Chabolla v. ClassPass Inc.*, 129 F.4th 1147 (9th Cir. 2025), the Ninth Circuit held that the terms-of-use hyperlink on "screen 1" of the defendant's website was not reasonably conspicuous because the visual aspects of that screen directed the user's attention elsewhere. *See id.* at 1157. Because the hyperlink was not



United States District Court
Northern District of California

reasonably conspicuous on screen 1, it did not matter whether notices of the terms of use on later screens were reasonably conspicuous. It was in this context that the court stated:

> We disagree that California's contract formation test can be met with broad reference to the conspicuousness of notice across three separate pages and a manifestation of assent constructed from three different action buttons. We must discern intent; this requires notice of contract terms as well as "unambiguous manifestation of assent to those terms[.]" For example, *it would be improper to infer that Chabolla manifested her assent on screen 1 to a notice she hadn't yet seen on screen 2*. So further discussion on the conspicuousness of the notices on screens 2 and 3 would be non-dispositive and fruitless.

*Id.* at 1158 (emphasis added). The factual circumstances in *Chabolla* are different from those in the instant case, which did not involve multiple screens.

*Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2022), also involves facts materially different from those in the instant case. In *Specht*, the Second Circuit was

> asked to determine whether plaintiffs[] . . . , by acting upon defendants' invitation to download free software made available on defendants' webpage, agreed to be bound by the software's license terms (which included the arbitration clause at issue), even though plaintiffs could not have learned of the existence of those terms unless, prior to executing the download, they had scrolled down the webpage to a screen located *below* the download button. We agree with the district court that a reasonably prudent Internet user in circumstances such as these would not have known or learned of the existence of the license terms *before* responding to defendants' invitation to download the free software, and that defendants therefore did not provide reasonable notice of the license terms. In consequence, plaintiffs' bare act of downloading the software did not unambiguously manifest assent to the arbitration provision contained in the license terms.

*Id.* at 20 (emphasis added). In the case at bar, the arbitration agreement was presented *before* any action buttons.

b. Unambiguous Manifestation of Assent

Because the arbitration agreements were reasonably conspicuous, the Court must next consider there were unambiguous manifestations of assent to the agreements. In *Berman*, the Ninth Circuit noted that "[a] user's click of a button can be construed as an unambiguous manifestation of assent [but] only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. In other



United States District Court
Northern District of California

words, "the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858. In *Berman* itself, the Ninth Circuit concluded that the notice was insufficient.

> Both webpages stated, "I understand and agree to the Terms & Conditions," but they did not indicate to the user *what action would constitute assent* to those terms and conditions. Likewise, the text of the button itself [which simply said "Continue"] gave no indication that it would bind plaintiffs to a set of terms and conditions. This notice defect could easily have been remedied by including language such as, "By clicking the Continue >> button, you agree to the Terms & Conditions."

*Id.* (emphasis added).

In the instant case, Plaintiffs suggest that the action buttons used by Robinhood ("Agree" or "Continue without agreeing") are insufficient. They contend that Robinhood could have "*ensured* unambiguous assent" if it had used different language on the action buttons. Opp'n at 14. According to Plaintiffs, Robinhood could and/or should have labeled the action buttons "Agree to arbitrate and continue" and "Decline to arbitrate and continue." Opp'n at 14; *see also* Chehal Decl. ¶ 10 ("While I cannot recall the sign-up screens with which I was presented . . . , I believe I would have thought that I needed to press 'Agree' in order to sign up for the Prediction Market Hub, for two reasons: first, because the 'Agree' field is highlighted in black while the 'Continue without agreeing' field is not; and second, because there is nothing on the screen saying that pressing the 'Agree' button is optional and that 'Continue without agreeing' would also have allowed me to sign up for the Prediction Markets Hub.").

Plaintiffs' argument is not persuasive. The user was clearly being presented with an arbitration agreement as reflected by the title of the agreement. The first paragraph of the agreement also made clear that it was an arbitration agreement. Furthermore, although not entirely clear, the sequence seems to be that, in signing up, a user is first presented with the Futures Client Agreement and only subsequently is the user presented with the arbitration agreement. Thus, the arbitration agreement was being called out for the user's attention as a separate contract for which agreement was sought. Ultimately, even if Robinhood could have used better or clearer language in its action buttons, its action buttons gave sufficient notice to Plaintiffs about what the legal

consequences of "clicking" the button would mean.

Accordingly, the Court concludes that Robinhood has sufficiently established that the 10 Plaintiffs were on inquiry notice of the arbitration agreements and accepted them by clicking on the "Agree" button.

c. Robinhood's Evidence re Dates/Locations of Assent to Arbitration Agreements

Plaintiffs contend that, even if inquiry notice is not an issue, the evidence Robinhood has submitted to establish assent by *some* Plaintiffs is problematic. These Plaintiffs have submitted declarations challenging, *e.g.*, dates and/or locations of the alleged agreements to arbitrate. *See* Opp'n at 12 ("Robinhood's records also fail to 'confirm,' as Robinhood contends, Martin Decl. ¶10, that certain Plaintiffs clicked on anything at all. *See Davidson Decl.*, Exs. 4 ¶11, 6 ¶10, 8 ¶11, 11 ¶11, 12 ¶11 (affirming Plaintiffs Patel, Collar, Austin, and Gregory did not sign up for a Derivatives account in the cities claimed, and Gayed signed up on a different day altogether).").

In its reply brief, Robinhood sufficiently addresses the date issue as raised in the Gayed Declaration:

> Plaintiff Gayed says Robinhood's records show that he signed up for his account on May 24 in New York but asserts that he signed up on May 23. ECF 56-7 ¶ 10. He misreads the records. The "+00" in each timestamp indicates that the date and time are in Coordinated Universal Time (UTC), not Eastern Daylight Time (EDT). Martin Decl. Ex. H ("2025-05-24 02:04:31.673923+00"). Translated to Gayed's time zone, the timestamp shows that Gayed signed up at 10:04 p.m. EDT on May 23, consistent with his declaration.

Reply at 6 n.2.

The location issue is adequately addressed as well.

> [O]ther Plaintiffs assert that they were not in the locations designated by Robinhood's geoIP data, e.g., ECF 56-9 ¶ 11, but it is well known that such data "is not always reliable," *see* M. Sag & J. Haskell, Defense Against the Dark Arts of Copyright Trolling, 103 IOWA L. REV. 571, 589 (2018), and that well-known fact says nothing about the accuracy of Robinhood's non-geoIP records of assent.

Reply at 6 n.2 (emphasis added). And for most, the locations match by state, even if not the specific city. Notably, none of the Plaintiffs outright denies agreeing to arbitration at some point.



United States District Court
Northern District of California

C. Scope of Agreement

Plaintiffs contend that, even if there were arbitration agreements between them and Robinhood, Robinhood has failed to show that the arbitration agreements cover the specific kind of claims asserted by Plaintiffs here. In other words, Plaintiffs argue that the claims they have pled do not fall within the scope of the arbitration agreement.[10]

The relevant arbitration agreements contain similar language regarding scope:

- "Any controversy or claim arising out of or relating to my futures account, transactions with Robinhood Derivatives, LLC pursuant to the Futures Client Agreement between us or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the National Futures Association, or the contract market upon which the transaction giving rise to the claim was executed." Martin Decl., Ex. E (Futures Arbitration Agmt.) (applicable to most Plaintiffs).
- "Any controversy or claim arising out of or relating to my Robinhood Derivatives account, or transactions with Robinhood Derivatives, LLC pursuant to the Futures Client Agreement between us or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the National Futures Association, or the contract market upon which the transaction giving rise to the claim was executed (such contract market, along with any clearing organization related thereto, an 'Exchange')." Martin Decl., Ex. F (Robinhood Derivatives Arbitration Agreement) (applicable to one Plaintiff) (emphasis added).

As above, the Court focuses on the first arbitration agreement as that is the agreement the majority of Plaintiffs at issue entered into.

In their pleadings, Plaintiffs have brought claims for violations of state gambling law, state consumer protection law, and state common law (unjust enrichment). The claims are based on the theory that, with the Kalshi sports event contracts, Robinhood *purports* to offer users a modern,

[10] The parties agree that the issue of scope is one for the Court to decide. There is no clause in any agreement between a Plaintiff and Robinhood providing that arbitrability issues are delegated to the arbitrator.

United States District Court
Northern District of California

sophisticated form of investing on a federally regulated commodities exchange but, *in reality*, unlawfully operates an unlicensed sports gambling program and misleads customers into believing that sports event contracts are not gambling. Plaintiffs essentially contend that, when they agreed to arbitrate, they only agreed to arbitrate disputes related to *true* investments on a federally regulated commodities exchange; they did not agree to arbitrate disputes that are not, in fact, true investments – *i.e.*, they did not agree to arbitrate gambling disputes. *See* Opp'n at 10 ("Robinhood built a commodity instrument, and it reaches commodity disputes. It does not reach these disputes.").

In response, Robinhood argues that Plaintiffs' position lacks merit because, on its face, the arbitration provision is broad – covering any claim "arising out of *or* relating to" (emphasis added). Robinhood emphasizes that, literally, Plaintiffs' claims do relate to their "futures account[s]" with Robinhood and their "transactions with Robinhood."

The Court acknowledges that "an order to arbitrate . . . should not be denied unless it may be said with *positive assurance* that the arbitration clause is *not susceptible of an interpretation* that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers v. Warrior Gulf Navig. Co.*, 363 U.S. 574, 582-83 (1960) (emphasis added). That being said, even though "[g]enuine interpretive disputes should be resolved in favor of arbitrability," "a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." *PaineWebber v. Hartmann*, 921 F.2d 507, 513 (3d Cir. 1990), *overruled in part on other grounds by Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002).

Here, Robinhood's position is not persuasive because it focuses on only certain phrases used in the arbitration agreement to the exclusion of others. But the scope of the arbitration agreement is informed by the entirety of the agreement. The agreement provides in relevant part as follows:

> Any controversy or claim arising out of or relating to my futures account, transactions with Robinhood Derivatives, LLC pursuant to the Futures Client Agreement between us or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the National Futures Association, or the contract market upon which the transaction giving rise to the claim was executed. After receipt of notice from Client that Client intends to submit a

> controversy to arbitration, or at the time Robinhood Derivatives, LLC notifies Client that it intends to submit a controversy to arbitration, Robinhood Derivatives, LLC will provide Client with a list of qualified forums.
>
> A "qualified forum" is an organization whose procedures for conducting arbitrations meet Acceptable Practices established by the Commodity Futures Trading Commission ("CFTC"). . . .
>
> . . . .
>
> CFTC rules require the inclusion of the following notice in this agreement:
>
> **THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION (CFTC), AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION.**
>
> **. . . .**
>
> **BY SIGNING THIS AGREEMENT, YOU: (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU OR ROBINHOOD DERIVATIVES, LLC MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE THAT MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF ROBINHOOD DERIVATIVES, LLC INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND YOU PREFER TO REQUEST A SECTION 14 "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION.**
>
> **YOU NEED NOT SIGN THIS AGREEMENT TO OPEN OR MAINTAIN AN ACCOUNT WITH ROBINHOOD DERIVATIVES, LLC. SEE 17 CFR 166.5.**

Martin Decl., Ex. E (Futures Arbitration Agmt.) (emphasis in original); *see also* 17 C.F.R. § 166.5(c)(7) (providing that an arbitration agreement must contain the cautionary language in bold above).

/ / /



United States District Court
Northern District of California

There are several important phrases from the arbitration agreement that Robinhood effectively ignores.

**First**, the very first sentence of the arbitration agreement states that "[a]ny controversy or claim arising out of or relating to my futures account, transactions with Robinhood Derivatives, LLC *pursuant to the Futures Client Agreement* or the breach thereof shall be settled by arbitration . . . ." Martin Decl., Ex. E (Futures Arbitration Agmt.) (emphasis added). The arbitration agreement, therefore, is tied inextricably to the Futures Client Agreement. This is true not only with respect to "transactions with Robinhood," which are undertaken pursuant to the Futures Client Agreement, but also with respect to "futures account[s]" with Robinhood, which are established in the first place when a customer enters into the Futures Client Agreement. *See also* Martin Decl., Ex. A (Futures Client Agmt. at 1) (noting that, by opening or using an account, a customer is agreeing to the terms of the Futures Client Agreement). The necessary connection between the arbitration agreement and the Futures Client Agreement is underscored by the fact that a customer is presented with both agreements at or about the same time they set up their account with Robinhood.

The focus therefore must shift to the Futures Client Agreement. That Agreement specifies that a customer is entering into the Agreement "in consideration of [Robinhood] agreeing to act as your broker in the execution, clearance or settlement of transactions **in Contracts** (as defined below) on your behalf." Martin Decl., Ex. A (Futures Client Agmt. at 1) (emphasis added); *see also id.* (Futures Client Agmt. § 3) ("[Robinhood] is registered with the CFTC under the CEA as a futures commission merchant and is a member of the [National Futures Association], and as such, may act as Client's broker **for Contracts**.") (emphasis added). The Agreement defines "Contracts" as "any futures, options on futures, commodity options, event contracts or other derivatives contracts and all interests therein, including any other cash transactions or any similar interests that may be purchased, sold, carried, or cleared through [Robinhood] **in our capacity as a CFTC-registered futures commission merchant**." *Id.* § 1 (Futures Client Agmt. § 1) (emphasis added). Contracts that have historically been transacted by a "CFTC-registered futures commission merchant" include such derivatives as commodity options and futures. Contracts



United States District Court
Northern District of California

transacted by such commission merchants have never, until recently, included gambling contracts as noted in *KalshiEx v. Assad*. And as discussed above, the "Special Rule" states that gaming (among other matters) may be excluded as a commodity. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)(V). Consistent with the Special Rule, the CTFC has enacted 17 C.F.R. § 40.11, which provides that "[a] registered entity shall not list for trading . . . [a]n agreement, contract, transaction or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references . . . gaming." 17 C.F.R. § 40.11. Thus, although "Contracts" as that term appears in the Futures Client Agreement refers to various kinds of derivative contracts, it contemplates contracts that have traditionally been and are currently regulated by the CFTC.[11] Gambling contracts are outside the scope of CFTC regulation and not within the meaning of "Contracts" under the Agreement.

**Second**, the scope of the arbitration agreement is further informed by first sentence of the arbitration agreement which states that claims "shall be settled by arbitration in accordance with the rules, then in effect, of the National Futures Association, or the contract market upon which the transaction giving rise to the claim was executed." Martin Decl., Ex. E (Futures Arbitration Agmt.). The Code of Arbitration for the National Futures Association provides that "disputes shall be arbitrated under this Code *if the dispute involves commodity futures contracts*." NFA Code of Arbitration § 2(a)(1) (emphasis added), *available at* https://www.nfa.futures.org/rulebooksql/rules.aspx?Section=5 (last visited 11/24/2026); *see also id.* § 2(b)(1) ("At the option of any party, the securities portion of a dispute involving unrelated futures and securities claims may, in the President's discretion, be arbitrated under this Code if the timeliness requirements of Sections 5 and 6 of this Code are met."). Thus, again, the agreement to

---

[11] *See* Congressional Research Service Report, *Introduction to Derivatives and the Commodity Futures Trading Commission* (Mar. 13, 2025), *available at* https://www.congress.gov/crs_external_products/R/PDF/R48451/R48451.2.pdf (last visited 11/24/2026) ("Derivatives are financial instruments that come in several different forms, including futures, options, and swaps. A derivative is a contract that derives its value from some underlying asset at a designated point in time. The derivative may be tied to a physical commodity, a stock index, an interest rate, or some other asset . . . . [¶] The Commodity Futures Trading Commission (CFTC), created in 1974, administers the Commodity Exchange Act (CEA) of 1936 and oversees the derivatives markets.").

arbitrate contemplates disputes about derivative contracts traditionally within the bounds of the National Futures Association such as commodity futures contracts.[12]

**Finally**, the scope of the arbitration agreement is informed by the provision which specifies: (1) that Robinhood will provide a customer with a list of qualified forums, (2) that a qualified forum is an organization whose procedures for arbitrations meet practices established by the CFTC, and (3) that there are three forums available for the resolution of "commodity disputes." Similar to above, this language underscores that the scope of the arbitration agreement is tailored to disputes over commodities (and futures) regulated by the CFTC. Gambling, which is excluded from commodities regulated by the CFTC, would not be something these fora would typically adjudicate.

Accordingly, when the entirety of the arbitration agreement is considered, it is evident that what the parties agreed to arbitrate were disputes about contracts regulated by the CFTC. The parties did not agree to arbitrate a dispute over something that is not such a contract (and which has been deemed out of bounds by the CFTC) and which is foreign to the prescribed arbitration fora. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (stating that "the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute").

Robinhood protests that, even if the Court were to adopt this interpretation, the parties' dispute would only be outside the scope of the arbitration agreement if the Court were to agree with Plaintiffs *on the merits* that the sports events contracts at issue *are* gambling contracts and not derivative contracts. Robinhood contends that merits issues are to be decided by an arbitrator and not a court.

/ / /

/ / /

---

[12] The arbitration agreement refers to arbitration by the rules of the National Futures Association *or* by the rules of "the contract market upon which the transaction giving rise to the claim was executed." Martin Decl., Ex. E (Futures Arb. Agmt.). "Contract market" implicitly means a designated contract market, or DCM. Here, neither party has provided the Court with Kalshi's arbitration rules or the rules of any other DCM.

United States District Court
Northern District of California

> [Plaintiffs] contend at length that the Agreement reaches only claims "with[in] the CFTC's jurisdiction" (Opp. 9) and that their claims do not qualify because the event contracts at issue (they say) are not "swaps" under the Commodity Exchange Act (CEA) (Opp. 3-9). But that argument is out of bounds at this stage because it is "focused upon the *merits*, rather than arbitrability, of" Plaintiffs' claims. *Dennis L. Christensen Gen. Bldg. Contractor, Inc. v. Gen. Bldg. Contractor, Inc.*, 952 F.2d 1073, 1077-78 (9th Cir. 1991) (emphasis added). When parties enter an arbitration agreement, they "agree to send the merits of the dispute to an arbitrator." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024). Courts thus do "not rule" on "merits question[s]" in resolving arbitrability. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68-69 (2019).

Reply at 7 (emphasis in original and added).

However, Robinhood has not pointed to any authorities as to why a court should not proceed with an evaluation of scope simply because the scope and merits issues are intertwined. In fact, there is authority to the contrary. *See Rite Aid of Penn., Inc. v. UFCW, Local 1776*, 595 F.3d 128, 136-37 (3d Cir. 2010) (stating that, "where the merits and arbitrability questions are inextricably intertwined, a court's arbitrability decision may, of necessity, touch incidentally on the merits"); *Int'l Bhd. of Elec. Workers, AFL-CIO., Loc. 1 v. GKN Aerospace N. Am., Inc.*, 431 F.3d 624, 627-28 (8th Cir. 2005) (stating that "the judicial responsibility to determine arbitrability takes precedence over the general rule to avoid consideration of the merits of a grievance"; "if a court is entirely blind to the merits of a grievance, then the parties could be forced to arbitrate grievances that have no relationship whatsoever to the collective bargaining agreement"); *UPS v. Union de Tronquistas De P.R., Local 901*, 426 F.3d 470, 472 (1st Cir. 2005) (stating that "'whether or not a company is bound to arbitrate . . . is a matter to be determined by the court' [and] [s]uch a duty must be performed even though it may require the court to interpret a bargaining agreement provision"); *Indep. Lift Truck Builders Union v. Hyster Co.*, 2 F.3d 233, 236 (7th Cir. 1993) (stating that "the rule that courts must decide arbitrators' jurisdiction takes precedence over the rule that courts are not to decide the merits of the underlying dispute[;] [i]f the court must, to decide the arbitrability issue, rule on the merits, so be it"). While the cases above are all labor cases, there is nothing to suggest that the labor context limits the reasoning of the decisions. Thus, the Court decides the scope issue even though it is intertwined with the merits issue. This is particularly appropriate where, as here, the arbitration agreement does not contain a

United States District Court
Northern District of California

delegation clause; gateway issues of arbitrability presumptively rest with the Court, not the arbitrator. *See Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1065 (9th Cir. 2020) (stating that gateway questions of arbitrability are for judicial determination unless the parties clearly and unmistakably provide otherwise).

On the merits, the Ninth Circuit's decision in *KalshiEX v. Assad*, 2026 U.S. App. LEXIS 26395, strongly suggests that Robinhood's sports event contracts are nothing more than sports bets. As discussed above, the Ninth Circuit rejected Kalshi's argument that its sports event contracts are derivative contracts over which the CFTC has exclusive jurisdiction. It further stated that sports event contracts have the "hallmarks of sports betting" which is a "quintessential form of gambling." *KalshiEX v. Assad*, 2026 U.S. App. LEXIS 26395, at *30-31. That being the case, and for the reasons stated above, sports bets (indeed, Kalshi sports bets, *see* Chehal Compl. ¶ 1) offered by Robinhood do not constitute contracts within the meaning of the Agreement and fall outside the scope of the arbitration agreement. This determination as to arbitrability is not, of course, a ruling on the merits of the underlying claims.[13]

## III. CONCLUSION

For the reasons stated above, Robinhood's motion to compel is denied. The parties are ordered to meet and confer to discuss a schedule for the filing of a consolidated amended complaint and Robinhood's response thereto.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[13] To be clear, Plaintiffs' claims largely rest on the proposition that sports event contracts are gambling contracts. However, it is not clear that Plaintiffs will necessarily prevail on the underlying merits of their claims based on that fact alone.

Because the Court concludes that Plaintiffs' claims are not within the scope of the arbitration agreement, it need not address any of the remaining issues briefed by the parties (unconscionability, public injunctive relief, and nonsignatory to an arbitration agreement).

United States District Court
Northern District of California

As part of the meet and confer, the parties should discuss whether it makes sense to temporarily stay litigation (or to otherwise limit litigation) to see if the Supreme Court grants the certiorari petition filed by the state of New Jersey in *KalshiEX, LLC v. Flaherty*, 172 F.4th at 220. The parties shall file a status report and/or stipulation within two weeks of the date of this order.

This order disposes of Docket No. 46.

**IT IS SO ORDERED**.

Dated: November 25, 2026

EDWARD M. CHEN
United States District Judge